HUGH J. HANLON, JR., Adm'r of the Estate of Hugh J. Hanlon III, Deceased, Plaintiff-Appellee, v. AIRCO INDUSTRIAL GASES *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—88—2037

Opinion filed September 20, 1991.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Algimantas P. Kezelis, Michael J. Ross, and Russell P. Veldenz, of counsel), for appellants.

Michael J. McArdle, Chartered, of Chicago (Michael J. McArdle, of counsel), for appellee.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

After Hugh J. Hanlon III was killed in a construction accident, plaintiff, the administrator of his estate, filed suit for wrongful death based on a theory of strict products liability. Following a jury trial, a verdict was returned in favor of plaintiff in the amount of $300,000. Defendants appeal and contend that: (1) the trial court erred when it entered a directed verdict in favor of plaintiff on defendants' affirmative defense of assumption of the risk; (2) the trial court abused its discretion making several evidentiary rulings over the defendants' objections; and (3) the trial court abused its discretion by submitting three jury instructions over the defendants' objections.

We reverse and remand for a new trial with directions.

Relevant to our disposition are the following facts as disclosed by the record. On August 23, 1978, Hugh J. Hanlon III (Hanlon) was killed in a construction accident in downtown Joliet, Illinois. He was killed when a pressurized gas tank exploded while he and a co-worker were attempting to spray some newly laid cement with a curing compound intended to prevent the cement from cracking.

The P.T. Ferro Construction Company (Ferro), Hanlon's employer, devised a setup consisting of two tanks with connecting apparatus to spray the curing compound. One tank contained 2,200 pounds of compressed nitrogen gas. A regulator with two gauges was connected to the discharge valve of the nitrogen tank. One gauge indicated the amount of nitrogen gas contained in the tank, and the other gauge indicated the amount of nitrogen gas being released from the tank. The pressure from the nitrogen tank could be adjusted by turning a T-handle located between the gauges. When turned completely on, a maximum of 200 pounds per square inch of pressure could be released through the regulator.

A four-foot rubber hose connected the nitrogen tank regulator to another, smaller tank which contained the curing compound. The four-foot rubber hose entered the compound tank at the top through a plug. Another 15-foot hose with a spray nozzle was attached to the bottom of the compound tank. The setup, therefore, allowed the nitrogen gas to enter the compound tank and propel the curing compound into the 15-foot hose and onto the cement. The entire setup had been placed on a movable cart.

Both tanks contained built-in devices which were intended to prevent the pressure from exceeding certain levels. Ferro maintained the nitrogen tank device at 18 pounds per square inch, substantially lower than the regulator's 200-pound-per-square-inch maximum capacity. The nitrogen tank device, however, was not intended to protect against an excess of pressure after the nitrogen entered another holding tank, which in this case was the compound tank. There was no testimony concerning the setting on the compound tank device. Also, the exact capacity of the galvanized steel compound tank itself was not known either before or after the explosion because it was not a "coded vessel." It was agreed at trial, however, that its capacity was, in light of the explosion, incompatible for the nitrogen tank.

The setup had been used at the site for the two weeks prior to the explosion. On the day of the explosion, Mike Riddle, a Ferro employee, and Edward Butler, a cement mason, prepared the setup for spraying.

In the past, Ferro had used a single tank with a manual air pump to spray the curing compound. In this instance, both Riddle and Butler testified that they believed the nitrogen tank contained oxygen instead of nitrogen. Both stated that no labels, markings, or warnings appeared on the nitrogen tank. An engineer for defendant Airco Industrial Gases (Airco), however, testified that the nitrogen tank at one time had a label indicating its contents but the label wore off over time.

Both Riddle and Butler knew that the T-handle controlled the amount of pressure released from the nitrogen tank and that Ferro had a rule that the T-handle was not to be turned to allow more than 15 pounds per square inch of pressure out of the tank. The rule was intended for the workers' safety.

Shortly before lunch, Butler unwound the 15-foot hose from around the cart and attempted to spray the curing compound. The setup did not work. Butler and Riddle decided to troubleshoot the problem. Riddle first turned the T-handle to shut off the pressure in the nitrogen tank. He admitted that he did so to maintain safety. Butler then unscrewed the nozzle from the 15-foot hose to check for any obstruction. Butler tried to spray again but the problem persisted.

Hanlon, who had recently been promoted to labor foreman for Ferro, arrived to help with the problem. He told Riddle to go to lunch. He then gave Butler some vice grips to loosen the plug on the top of the compound tank in order to "bleed" the existing pressure from the compound tank. Butler first checked to see that the T-handle on the nitrogen tank regulator was in the off position. Then, as the pressure in the compound tank escaped, the plug "popped" to the ground. Butler picked up the compound tank and shook it to loosen any obstruction. He then reconnected the regulator to the plug, turned the T-handle and heard the nitrogen gas go into the compound tank. He was still unable to spray the curing compound. He turned to tell Hanlon of this and saw Hanlon reaching for the T-handle. Butler gave inconsistent testimony whether Hanlon was actually turning the T-handle. Butler warned Hanlon, "Don't touch that. It's supposed to be set."

Butler turned and bent down to grab the nozzle end of the 15-foot hose, which was on the ground. At that point the compound tank exploded. Butler remembered hearing yelling and he fell to the ground. Hanlon, who had been standing next to the compound tank, was killed in the explosion. Butler was injured and taken to the hospital. The compound tank, which shot like a rocket into the air, was found on the roof of a nearby, two-story building. The investigation after the

explosion revealed that the T-handle on the nitrogen tank had been turned completely on.

Defendant Airco manufactured the nitrogen tank and the regulator. Defendant Kenwald Welding & Supply Company, Inc. (Kenwald), was Airco's distributor for the Joliet area. Kenwald had a machine which converted liquid nitrogen into gas. This machine was used to fill and refill Airco's nitrogen tanks according to the needs of Airco's clients.

Hanlon's second-amended complaint alleged, in part, that the nitrogen tank was unreasonably dangerous for its intended use because it failed to bear the appropriate warnings which should have (1) identified the contents of the tank and (2) warned users that the tank contained high pressure gas and that it should not be connected to a low pressure tank.

At trial, Robert J. Stanis, a consulting engineer, testified that gas under high pressure is inherently dangerous because it can expand suddenly and catastrophically if it is inappropriately let go from its container. He testified further that because the hazard cannot be designed out of the product, the only alternative is to affix to the product a statement of the hazard to enable the user to take precautionary measures. In this case there was no dispute that the nitrogen tank contained no warning that it should not be connected to a low pressure tank.

Edward Holmes, another consulting engineer, testified for the defendants that the nitrogen tank presented an open and obvious danger; that the shape of a pressurized gas tank is unique and everybody recognizes that such tanks contain high pressure gas; that the presence of the regulator on the nitrogen tank made it obvious that the tank contained high pressure gas; and that the gauges actually indicated the amount of pressure in the tank and the amount of pressure being released from the tank. In his opinion, the nitrogen tank's failure to contain warnings did not make it unreasonably dangerous as long as the user knew what was in the tank and how to use it.

During trial, the trial court made several evidentiary rulings over the defendants' objections. The court admitted into evidence three photographs of the construction site after the explosion. The bodies of Hanlon and Butler were visible in each photograph. Hanlon's income tax returns for the years prior to his death were also admitted into evidence for the purpose of establishing lost future income as an element of damages. The trial court also permitted a line of questioning by plaintiff's counsel directed at Riddle and Butler concerning whether they knew that the setup was dangerous on the day of the

explosion. Finally, the court allowed the testimony of various witnesses concerning certain industry recommendations for the labeling of pressurized gas. These recommendations were contained in a text published in 1981, three years after the date of the explosion.

At the conclusion of the evidence, the attorneys argued the issue of defendants' affirmative defense of assumption of the risk. The trial court entered a directed verdict in favor of plaintiff on the defense.

The defendants objected to three jury instructions given by the trial court. The first instruction listed lost future income as an element of damages. Defendants objected to this instruction on the ground that there was no evidence with which to measure plaintiff's future income.

The second and third instructions objected to by defendants essentially addressed the defendants' failure to warn. One of these instructions stated:

"The plaintiff claims that Hugh Hanlon, III, was fatally injured while using the [nitrogen tank] and that there existed in the [nitrogen tank] at the time it left the control of the defendants a condition which made the [nitrogen tank] unreasonably dangerous in one or more of the following respects in that it:

1. Failed to have an identifying label: NITROGEN;

2. Failed to bear the signal word: CAUTION;

3. Failed to bear a warning: HIGH PRESSURE;

4. Failed to bear a precautionary statement: USE ONLY WITH EQUIPMENT COMPATIBLE WITH THIS PRODUCT.

The plaintiff further claims that one or more of the foregoing was a proximate cause of his injuries.

AIRCO denies that the [nitrogen tank] was ever in its control;

KENWALD denies that any of the claimed conditions existed in the [nitrogen tank] at the time the [nitrogen tank] left its control;

Both defendants deny that any claimed condition of the [nitrogen tank] was unreasonably dangerous; and both defendants deny that any claimed condition of the [nitrogen tank] was a proximate cause of plaintiff's injuries."

The other instruction stated:

"On the day of August 23, 1978, the Compressed Gas Association, in its Compressed Gas Association pamphlet C-7, dated 1976, had recommended the following standard:

All nitrogen cylinders should contain the following warning: NITROGEN, NON-FLAMMABLE, HIGH PRESSURE,

USE ONLY WITH EQUIPMENT COMPATIBLE WITH THIS PRODUCT.

If you ladies and gentlemen decide that the defendants Airco Industrial Gases and Kenwald, Inc. failed to comply with this recommendation, you may consider that fact with all the other facts and circumstances in evidence in determining whether or not the lack of such warning rendered the nitrogen gas cylinder unreasonably dangerous on the date of death of plaintiff's decedent."

Defendants objected to these instructions, in part, on the ground that they were non-Illinois Pattern Jury Instructions (IPI).

At the conclusion of the trial, the jury returned a verdict in favor of plaintiff in the amount of $300,000. The trial court entered judgment on the verdict and denied the defendants' post-trial motions. This timely appeal followed.

OPINION

### ASSUMPTION OF THE RISK ISSUE

■■ ■ In the context of a wrongful death case based on strict products liability, the affirmative defense of assumption of the risk requires proof of a deliberate decision by the decedent to encounter a known risk, or a willingness on the part of the decedent to take a chance. (*Clark v. Crane Carrier Co.* (1979), 69 Ill. App. 3d 514, 387 N.E.2d 871.) The courts apply a subjective standard rather than a reasonable person standard to determine whether the decedent was aware of the known risk. (*King v. American Food Equipment Co.* (1987), 160 Ill. App. 3d 898, 513 N.E.2d 958.) However, a showing of the decedent's awareness is not limited to direct evidence but may also include circumstantial factors like the decedent's age, experience and knowledge; whether a decedent was aware of the known risk is to be deduced from the totality of the evidence. (*Campbell v. Nordco Products* (7th Cir. 1980), 629 F.2d 1258.) In light of this, a determination of whether a decedent assumed the risk is ordinarily a question for the jury. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) Finally, the affirmative defense of assumption of the risk no longer completely bars recovery; instead, the misconduct will be compared in the apportionment of damages. *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 454 N.E.2d 197.

Although the burden of proof for this affirmative defense is on the defendant, we must view the evidence relevant to the trial court's

directed verdict in the light most favorable to the defendants. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

Defendants argue that the following evidence, viewed in the light most favorable to them, shows that Hanlon made a deliberate decision to encounter a known risk or was willing to take a chance. There was no dispute that the setup was not functioning the day of the explosion. Instead of returning the setup for repairs, Hanlon and his co-workers attempted to troubleshoot the problem. The workers were careful to turn off the nitrogen pressure each time they disassembled the setup in order to maintain safety. Thus, the workers knew that by troubleshooting the problem there was a risk of injury.

Ferro had a rule that the T-handle should not be turned to allow more than 15 pounds per square inch of pressure out of the tank. All Ferro employees were aware of this rule. However, Butler's testimony, when viewed in the light most favorable to the defendants, shows that Hanlon was touching the T-handle right before the explosion. After the explosion, the T-handle was found turned completely on. Although Hanlon's brief argues that there was no indication that violating the rule would cause a severe explosion, evidence of a violation indicates, at least, that Hanlon was willing to take a chance.

Furthermore, a consulting engineer retained by defendant Kenwald testified that it was his opinion the nitrogen tank presented an open and obvious danger. The engineer testified that the shape of a gas tank is unique and everybody recognizes that such tanks contain high pressure gas; that the presence of the regulator on the nitrogen tank made it obvious that the tank contained high pressure gas; and that the gauges actually indicated the amount of pressure in the tank and the amount of pressure being released from the tank.

Finally, everyone who had knowledge of Hanlon and his work testified that he was a careful, conscientious, experienced cement worker. In fact, Hanlon had been recently promoted to foreman. The setup itself had been used at the particular site for at least two weeks prior to the explosion.

In light of the totality of this evidence, when viewed in the light most favorable to the defendants, we hold that the record sufficiently raised the question whether Hanlon made a deliberate decision to encounter a known risk or had a willingness to take a chance. We are also reminded again that a determination of whether a decedent assumed the risk is ordinarily a question for the jury. Therefore, the trial court erred by entering a directed verdict on the defendants' affirmative defense of assumption of the risk. At the new trial, defend-

ants are to be allowed to present this affirmative defense and the jury should be instructed accordingly.

Before leaving this issue, it is necessary to distinguish one case upon which the trial judge apparently relied upon in entering the directed verdict. In *King v. American Food Equipment Co.* (1987), 160 Ill. App. 3d 898, 513 N.E.2d 958, the injured plaintiff was using a meat-mixing machine at the defendant company when he saw a co-worker put his hand on the power switch across the room. With the mistaken belief that the co-worker had turned the machine's power off, the plaintiff put his hand into the machine and lost four fingers. The machine itself had no visual indicator showing whether the power was on or off. The trial judge disallowed the defendant's assumption of the risk defense stating that there was no evidence presented to prove that the plaintiff deliberately decided to encounter a known risk. The appellate court affirmed. Here, although the nitrogen tank had no warnings or labels, it did have a regulator with gauges indicating the amount of pressure being released from the tank. Also, although Hanlon was at all times aware of Ferro's rule, there is evidence that Hanlon violated this rule. Finally, there was evidence that the danger of explosion was open and obvious. We find that these facts distinguish this case from the *King* case relied upon by the trial judge.

### EVIDENTIARY RULINGS ISSUE

The determination whether evidence is admissible rests in the discretion of the trial court, and the exercise of such discretion will not be disturbed on review unless it has been clearly abused. *Behrstock v. Ace Hose & Rubber Co.* (1986), 147 Ill. App. 3d 76, 496 N.E.2d 1024.

■ The trial court admitted into evidence over the defendants' objections certain photographs of the construction site after the explosion. The bodies of Hanlon and Butler were visible in the photographs. The defendants argue that these pictures should not have been admitted into evidence because the gruesome and inflammatory nature of the pictures outweighed their probative value.

In *Bullard v. Barnes* (1984), 102 Ill. 2d 505, 468 N.E.2d 1228, the Illinois Supreme Court held that if photographs of a decedent in a wrongful death case have sufficient probative value, they should be admitted in spite of their gruesome or inflammatory nature. There, the court affirmed the trial court's admission of morgue photographs of the decedent taken after a traffic accident. The court also emphasized that a decision on the admission of photographs rests within the broad discretion of the trial court.

Here, the photographs had some probative value because they helped the jury understand the scene at the construction site and the force of the explosion. Accordingly, we hold that the trial court did not abuse its discretion by admitting into evidence the photographs in question.

The trial court also admitted into evidence Hanlon's income tax returns for the years prior to his death. Defendants argue that the past income tax returns were not relevant toward establishing lost future income. Defendants add that there was no evidence presented on the wages of an average cement mason and any measure of future income would be purely speculative.

■ A jury may consider what a decedent earned or might reasonably be expected to earn in the future in measuring future income. (*Harris v. Day* (1983), 115 Ill. App. 3d 762, 451 N.E.2d 262.) In *Harris*, a minimal wage rate for an injured high school graduate with two years of college was used to measure future income despite the defendant's argument that the rates were speculative. In our case, the income tax returns were even less speculative because they represented what Hanlon actually earned. Accordingly, we hold that the trial court did not abuse its discretion by admitting into evidence Hanlon's past income tax returns.

■ Defendants objected to a line of questioning directed to Riddle and Butler concerning whether they knew that the setup was dangerous on the day of the explosion. Defendants reason that "by asking the witnesses if they thought the system was dangerous, plaintiff asked the witnesses to testify [as experts] to whether or not the product in question had an unreasonably dangerous defect." This seems to be a rather specious objection. The questioning concerning whether these workers had knowledge of a danger (thereby suggesting whether Hanlon had such knowledge) applies to the issue of the defendants' assumption of the risk defense. Therefore, for the reason that the questioning was relevant to defendants' affirmative defense, we hold that the trial court did not abuse its discretion by allowing the testimony.

■ The trial court also allowed the introduction of testimony concerning certain industry recommendations contained in a text published in 1981. Defendants rely on *Murphy v. Messerschmidt* (1977), 68 Ill. 2d 79, 368 N.E.2d 1299, and argue that where a plaintiff seeks to introduce testimony of industry standards published years after the time of the injury, but there is no showing that the industry standards were in effect at the time of the injury, introduction of the testimony is error. Here, defendants argue that the 1981 industry recommenda-

tions were not relevant "in time" because the explosion occurred in 1978. However, plaintiff's expert witness testified that the recommendations reflected "the basic knowledge" in 1978. Therefore, as the trial court indicated, the defendants' proper recourse was through impeachment testimony on cross-examination. Accordingly, we hold that the introduction of the testimony concerning the 1981 industry recommendations was not an abuse of discretion.

## JURY INSTRUCTIONS ISSUE

It is within the trial court's discretion to determine which instructions shall be given, and the exercise of such discretion will not be disturbed on review unless it has been clearly abused. *Hollembaek v. Dominick's Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773, 484 N.E.2d 1237.

■ Defendants objected to the submission of a jury instruction listing future income as an element of damages. For the same reasons that we held that the admission of Hanlon's past income tax returns into evidence was not error, we hold that the submission of this jury instruction was not an abuse of discretion.

Defendants also objected to the submission of two non-IPI jury instructions essentially addressing the defendants' duty to warn. The parties agree that Illinois Pattern Jury Instructions, Civil, No. 400.07 (Supp. 1977), states that no instructions on "duty to warn" be given, but that *Renfro v. Allied Industrial Equipment Corp.* (1987), 155 Ill. App. 3d 140, 507 N.E.2d 1213, nonetheless approved of a duty to warn instruction where the law was stated with substantial accuracy and without misleading the jury. The instruction in *Renfro* told the jury, "[t]he law does not say what warnings are reasonably necessary or how long they should be communicated. That is for you to decide." (*Renfro*, 155 Ill. App. 3d at 165, 507 N.E.2d at 1233.) In other words, the instruction advised the jury of its discretion on the issue of warnings.

In the case at bar, defendants argue that the first non-IPI instruction argued and highlighted the plaintiff's theory of the case. Furthermore, the second non-IPI instruction failed to state that the industry recommendations were voluntary and that the jurors were free to decide that the proposed warnings were unreasonable.

■ However, we find that the first non-IPI instruction merely presented the "plaintiff's claims" and clearly stated that "both defendants deny" those claims. The second non-IPI instruction expressly stated that the Compressed Gas Association only "recommended" the proposed warnings and that the jurors "may" consider

as part of their deliberations the defendants' failure to comply with the proposed warnings. In light of these facts, we hold that the non-IPI instructions as given stated the law with substantial accuracy and did not mislead the jury. Therefore, the trial court did not abuse its discretion by submitting the non-IPI instructions over the defendants' objections.

In summary, we remand this case for a new trial, thereby allowing defendants to argue to the jury their affirmative defense of assumption of the risk.

Reversed and remanded for a new trial with directions.

MURRAY and McNULTY, JJ., concur.