STEVEN POOLE, Plaintiff-Appellee, v. THE CITY OF ROLLING MEADOWS *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—91—1540

Opinion filed September 10, 1993.—Rehearing denied October 12, 1993.

Flynn, Murphy, Ryan & Seyring, of Chicago (Richard T. Ryan and Mark F. Smolens, of counsel), for appellants.

Cooney & Conway, of Chicago (Robert J. Cooney, Jr., of counsel), for appellee.

JUSTICE COUSINS delivered the opinion of the court:

On August 18, 1984, the plaintiff, Steven Poole (Poole), was shot in the abdomen by defendant, Michael Conroy (Conroy), who was on duty as a police officer with the Rolling Meadows police department. Plaintiff brought a two-count complaint against Conroy and the City of Rolling Meadows (the City) which alleged that Conroy and the City acted wilfully and wantonly under State law, and that Conroy was liable under section 1983 of the Federal civil rights statute. (42 U.S.C. §1983 (1982).) With respect to the section 1983 claim, the jury found for defendant Conroy. On the State law claim that Conroy and the City acted wilfully and wantonly, the jury returned a verdict against both defendants and assessed total damages in the amount of $199,164.81. The jury further found that the plaintiff was 75% contributorily negligent and the court entered judgment in his favor in the amount of $49,791.20. Subsequently, Poole filed a post-trial motion challenging the reduction of damages for contributory negligence where the defendants' conduct was wilful and wanton. The trial court granted the motion, reinstated the full jury award of damages, and entered judgment notwithstanding the verdict against both defendants in the amount of $199,164.81. Defendants' post-trial motion challenging the modified judgment was denied.

On appeal defendants raise the following issues: (1) whether the trial court erred in reinstating the full award of damages; and (2) whether the cumulative effect of trial errors deprived defendants of a fair trial.

We affirm.

BACKGROUND

On August 18, 1984, at approximately 7 p.m., Bruce Meyer (Meyer), a resident of 1865 Polk Street in the City of Rolling Meadows, telephoned the Rolling Meadows police department, and reported that he had seen a person whom he did not recognize climb a fence in the back yard of the house located at 1864 Taft, go up on the roof, and enter the bedroom window.

Pursuant to that telephone conversation, officers were dispatched to investigate at 1864 Taft by Rolling Meadows communications officer Wisniewski:

"There's been a report of a subject trying to get into the second floor window, 1864 Taft, 1864 Taft, described as a male white wearing a white T-shirt, blue jeans, and he did get—get entry into the second floor window."

Four Rolling Meadows police officers responded to the call: defendant Conroy, Officer Bruce Branca (Branca), who was riding with Sergeant Gerald Broderick (Broderick), and Officer Joseph Waitzman (Waitzman). These officers testified that the following events occurred after they responded to the call.

All squad cars arrived in the area at approximately the same time. After the officers conducted a perimeter check of the premises, Broderick instructed Branca to take a position at the northwest side of the house and Waitzman to occupy the southeast corner of the house. Broderick knocked on the front door, but received no response. He then walked around to the rear of the house and observed an open window leading into the kitchen of the house. He called out, "police officers, anybody there?" several times; again, there was no response.

From his vantage point, Waitzman was able to observe the window which had been identified as the point of entry by the complainant. He could see that the screen to the window appeared to be out of its track. Waitzman also observed two automobiles in the driveway, one of which had a warm hood and was registered to Greg Finn of Des Plaines, Illinois.

When a request was made to the police dispatchers to attempt to make telephone contact with whoever had entered the home, Broderick was standing by the southwest side of the house, near the kitchen window in the rear of the house. He testified that he heard the phone ring several times with no answer. Waitzman and Branca also testified that they heard the telephone ringing inside the home. However, Conroy, who was on the roof near the bedroom window, testified that he did not hear the phone ring.

Conroy had ascended to the garage roof by using his car as a step ladder and receiving assistance from Waitzman. Shortly thereafter, Branca and Waitzman obtained a ladder, with which Broderick and Waitzman also climbed onto the garage roof. Broderick and Conroy decided to enter the home through the bedroom window. Before entering, Conroy leaned into the window and announced the presence of police officers outside, but no one responded. Conroy and Broderick then climbed through the window and into the master bedroom. They began to search the second floor of the home, continually shouting words to the effect, "police officers—anyone inside here?" Finding no

one, and receiving no response, the officers proceeded down the stairway to the first floor.

When the officers had reached the first floor of the home, they continued to announce their presence. Waitzman testified that from his position outside the bedroom window on the garage roof, he was able to hear Conroy and Broderick periodically announcing their presence. After checking the living and dining room areas, the two officers entered the kitchen and at that point separated; Broderick entered the attached garage area, and Conroy entered a hallway which led from the kitchen to the family room. Conroy testified that at the time he walked down the hallway, the area was "real dark."

When he reached the family room, Conroy took a step into the room and began to search for a light switch. At the time, his back was to the hallway and the door which led to the basement. Conroy heard noises which he thought were made by Broderick returning from the garage. He stopped for a second, at which time he heard two thud-like noises, followed by a cracking noise which sounded like someone kicking open a door. Conroy testified that as he spun around while holding his weapon tucked at his waist area, he observed a figure lunging out at him from the doorway of the basement. He could not see the person's hands. He could see the person's center torso area, and he observed that the figure's right arm was elevated. As he spun around, moving backwards, and slightly off balance, Conroy shouted "freeze!" Conroy testified that the figure continued to come at him with its hands obscured in the darkness. Fearing that this person lunging at him had some type of weapon, Conroy fired a shot. The person stopped, and stepped back into the basement door. Conroy stepped forward, saw that the person no longer constituted a threat, and recognized the person as Steven Poole. Conroy immediately radioed for an ambulance.

Broderick, whose view was obscured by the open basement door, testified that 1 to 1½ seconds elapsed between the time he heard Conroy shout "freeze, police" and the time a shot rang out. When he reached the end of the hallway where Conroy and plaintiff were located, Broderick observed that the hallway was dark.

Upon entering the Poole home after hearing the gunshot, neither Branca nor Waitzman was able to activate any of the lights in the Poole home. Lieutenant Keith Frangiamore, one of the Palatine fire department paramedics who responded to the scene, described the lighting conditions in the hallway as "fairly dark," and recalled needing to use a flashlight when examining the injured plaintiff. Officer Marvin Hamann was the investigator called to secure the scene and

inventory the evidence. Hamann noted that none of the lights in the house were operational and, upon checking the basement, he discovered that the main circuit breaker in the house had been thrown.

Plaintiff testified to a different version of the events which occurred in the Poole home on August 18, 1984. Plaintiff, who had just graduated from high school, had resided with his mother and brothers at the 1864 Taft residence prior to August 18, 1984. In mid-July, plaintiff and a friend leased an apartment, and plaintiff began moving into that apartment near the end of July. As of August 18, 1984, plaintiff still had a number of his possessions, including clothing, at his mother's home at 1864 Taft. Plaintiff testified that in the weeks prior to the August 18 incident, he visited his mother's house about every other day. His mother testified that even after plaintiff moved out, he still had a key to the front door; she stated that he was welcome to come over to the home any time he desired to do so.

August 18, 1984, was a Saturday, and plaintiff worked half a day and then drove a co-worker home. He then drove to 1864 Taft to obtain some clothes to wear on his date that evening. Upon arriving, he discovered that the front door was locked and that there was no front door key on his key ring. After plaintiff circled the house looking in vain for an open door, he decided to enter the home through his mother's bedroom window. He entered the home about 6:30 or 7 p.m.

Plaintiff testified that he went downstairs to the kitchen, where he ate a sandwich and drank a Coke. He stated that the kitchen window was closed. Plaintiff then went downstairs into the basement to get some clothes to wear. While in the basement, he phoned his girl friend, Jeanette Laymon. During that conversation, he testified that he heard one click on the line, and the Poole house had "call waiting," a telephone service which permitted more than one call to be answered at a time. He did not answer the other line, but instead continued his conversation with Laymon for several more minutes. Plaintiff denied ever hearing officers shouting or announcing their presence in his mother's home. He also denied ever hearing the phone ring prior to the shooting incident.

Plaintiff testified that he terminated the telephone conversation with his girl friend when he heard creaking noises upstairs. He stated that it took him between three and eight seconds to walk up the basement stairs. When he reached the top of the stairs, he opened the door slightly and peered out. Relieved to see a uniformed policeman, he opened the door and said "hey." Without saying a word, the officer spun around and shot plaintiff in the stomach. Plaintiff described the

area as "fairly well lit" with artificial light coming from the basement, and natural light coming through the windows.

After hearing all the evidence, the jury returned a verdict for plaintiff on the State law claim of wilful and wanton conduct, assessing plaintiff's total damages at $199,164.81, but reduced that award by the percentage of contributory negligence attributable to plaintiff, which was found to be 75%. Judgment for plaintiff was entered on the jury's verdict in the amount of $49,791.20. Subsequently, the trial court granted plaintiff's request for post-trial relief and entered a judgment notwithstanding the verdict in the amount of $199,164.81. The trial court denied defendants' post-trial motion challenging the reinstatement of the full award of damages, and this appeal followed.

OPINION

I

Defendants first contend that the trial court erred in reinstating the full award of damages. Defendants also argue that the trial court erred in refusing to grant them a new trial to allow the jury to determine whether plaintiff acted wilfully and wantonly and, if so, to compare plaintiff's wilful and wanton conduct with defendants' wilful and wanton conduct. We disagree.

At the time of trial, two appellate court decisions from the fourth district had allowed a comparison of plaintiff's contributory negligence with defendants' wilful and wanton conduct. (See *Yates v. Brock* (1989), 191 Ill. App. 3d 358; *State Farm Mutual Automobile Insurance Co. v. Mendenhall* (1987), 164 Ill. App. 3d 58.) However, between the time judgment was entered on the verdict and the filing of post-trial motions, the First District of the Appellate Court issued *Burke v. 12 Rothschild's Liquor Mart, Inc.* (1991), 209 Ill. App. 3d 192, which disagreed with the fourth district cases and held that a plaintiff's contributory negligence cannot be compared with a defendant's wilful and wanton conduct. (*Burke*, 209 Ill. App. 3d at 205-06.) Plaintiff filed a post-trial motion seeking judgment *n.o.v.* to reinstate the full award of damages, and the trial court granted plaintiff's motion. The trial court denied the defendants' motion for a new trial.

After the appeal was filed, the Illinois Supreme Court affirmed *Burke*. (*Burke v. 12 Rothschild's Liquor Mart, Inc.* (1992), 148 Ill. 2d 429.) The Illinois Supreme Court held that ordinary negligence cannot reduce damages recovered for a defendant's wilful and wanton misconduct. The court based its decision on the different degrees of culpability involved in ordinary negligence and wilful and wanton mis-

conduct. (*Burke*, 148 Ill. 2d at 451-52.) As the supreme court noted, "willful and wanton conduct carries a degree of opprobrium not found in merely negligent behavior." (*Burke*, 148 Ill. 2d at 451.) In light of this decision, we find that the trial court's decision to reinstate the full award of damages was proper.

Defendants argue that the appropriate remedy was not reinstatement of the full award of damages, but rather, a new trial. We disagree. This issue recently came before this court in *Medina v. City of Chicago* (1992), 238 Ill. App. 3d 385. In *Medina*, the court, presented with facts similar to those at bar, concluded that the appropriate remedy was to reinstate the full jury award which was reached before comparison with the plaintiff's negligence. (*Medina*, 238 Ill. App. 3d at 394.) The Illinois Supreme Court has denied leave to appeal from the decision in *Medina*. In this case, the doctrine of *stare decisis* now applies.

## II

Defendants next contend that the cumulative effect of errors allegedly committed by the trial court deprived them of the right to a fair trial.

■ First, defendants assert that the trial court's erroneous rulings and improper interruptions of defense counsel's closing argument severely prejudiced their right to a fair trial. We find no merit in defendants' contention.

During closing argument, counsel may be vigorous and eloquent and make fair comment upon the evidence. (*Augenstein v. Pulley* (1989), 191 Ill. App. 3d 664, 670; *Schwedler v. Galvan* (1977), 46 Ill. App. 3d 630, 641-42.) This does not give counsel the right to misrepresent the evidence or argue facts not in evidence. (*Babcock v. Chesapeake & Ohio Ry. Co.* (1979), 83 Ill. App. 3d 919, 933; *Schwedler*, 46 Ill. App. 3d at 642.) Moreover, although counsel may properly draw inferences from the evidence during closing argument, he may not create his own evidence. (*Augenstein*, 191 Ill. App. 3d at 670.) Finally, counsel may not refer to the fact that certain evidence was excluded by the court. *Schwedler*, 46 Ill. App. 3d at 642.

In this case, the trial court properly sustained objections to defense counsel's mischaracterizations of witnesses' testimony. An objection was also correctly sustained because of improper comments by defense counsel regarding the exclusion of certain evidence by the court. The proper scope of closing argument is for the trial court to determine, and unless the court has abused its discretion, its determination will not be reversed. (*Brown v. Moawad* (1991), 211 Ill. App.

3d 516, 528.) After careful review, we conclude that the trial court did not abuse its discretion by restricting defense counsel's closing argument.

■ Defendants next contend that the trial court erred in interfering with defense counsel's attempts to cross-examine the plaintiff. Defendants' argument is without merit. We have considered the rulings made by the trial court and we perceive no prejudicial error. The scope of cross-examination is within the sound discretion of the trial court (*Lockett v. Board of Education for School District No. 189* (1990), 198 Ill. App. 3d 252, 268; *Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 313), and we find no abuse of that discretion in this instance.

■ Defendants next assert that under *Sherrod v. Berry* (7th Cir. 1988), 856 F.2d 802, the trial court erred in denying their motion *in limine* to bar any testimony that the plaintiff was discovered to have been unarmed subsequent to the shooting incident.

In *Sherrod*, Ronald Sherrod was shot and killed by Officer Berry of the Joliet police department. His father filed a Federal civil rights action against Berry and the City of Joliet. At trial, Berry claimed that the decedent made "a quick movement with his hand into his coat *** [as if] he was going to reach for a weapon." (*Sherrod*, 856 F.2d at 803.) Over the objection of the defendants, the district court admitted evidence which indicated that a search of the deceased failed to uncover a weapon. (*Sherrod*, 856 F.2d at 804.) The Court of Appeals, while recognizing that its decision should not be interpreted as establishing a black letter rule precluding the admission of evidence which would establish whether a section 1983 plaintiff was unarmed at the time of the incident, stated:

> "Knowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment." *Sherrod*, 856 F.2d at 805.

We find *Sherrod* to be distinguishable. We agree with the *Sherrod* court's conclusion that evidence gleaned from investigations which occurred after the fact has no relevance to the officer's state of mind at the time of a shooting. In the instant case, however, there was no evidence from anyone that an "after the fact" analysis revealed whether plaintiff was, in fact, armed with a weapon at the time of the shooting. Instead, plaintiff was properly permitted to testify that as he walked up the stairs and opened the basement door, he had no weapon. The determination as to the admissibility of evidence rests in the sound discretion of the trial court, and the exercise of such discre-

tion will not be disturbed on review unless it has been clearly abused. (*Hanlon v. Airco Industrial Gases* (1991), 219 Ill. App. 3d 777, 786; *Country Mutual Insurance Co. v. Adams* (1980), 85 Ill. App. 3d 501, 506.) We conclude that the court did not abuse its discretion in allowing plaintiff to testify that he was unarmed at the time he was shot.

■ Finally, defendants argue that in contravention of Supreme Court Rule 220 (134 Ill. 2d R. 220), the trial court improperly permitted Peter Striupaitis (Striupaitis), a forensic chemist, to proffer undisclosed expert opinion testimony about the distance between plaintiff and Conroy at the time of the shooting.

Supreme Court Rule 220 governs the disclosure of expert witnesses. An expert witness is "a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial." (134 Ill. 2d R. 220(a).) "In order to ensure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party ***." 134 Ill. 2d R. 220(b)(1).

Striupaitis was the assistant lab manager and forensic scientist in the Bureau of Forensic Sciences, Suburban Chicago Forensic Science Laboratory with the State Police. In August of 1984, the Rolling Meadows police department submitted items of evidence to Striupaitis and directed him to conduct certain tests in order to resolve questions about the shooting which is the subject matter of this litigation. Pursuant to this request, Striupaitis conducted scientific tests to answer the questions presented by the City and incorporated his findings in a laboratory report which he completed in August 1984 and submitted to the Rolling Meadows police department.

Plaintiff called Striupaitis as a witness at trial, but did not disclose him as a Rule 220 expert. After testifying as to his extensive qualifications as an expert in the field of firearms examination, Striupaitis testified about the testing he did on clothing worn by the plaintiff at the time he was shot. First, Striupaitis testified that there was an absence of any gunpowder burns or gunpowder patterns on the clothing he tested. He then testified that he conducted a "sodium rhodizonate test" on the clothing to ascertain the existence of lead and the test was negative. The witness was then asked the following:

> "Q. Based upon your experience with weapons and ammunition of the kind submitted to you and based upon your negative findings both with respect to powder and with respect to lead,

did you draw any conclusions at all insofar as a range or a possible range between the shooting victim and the person who was shooting?"

Over objection, Striupaitis responded:

"I know from prior experience that there will be a pattern left at three feet, somewhat of a pattern left but less so as far as tightness of the powder at four feet, and no pattern left at five feet, so somewhere along the lines, if you want to bracket it, less than five feet but greater than four and then beyond will there not be a powder pattern present."

Defendants concede that portions of Mr. Striupaitis' testimony did not constitute expert opinion under Illinois Supreme Court Rule 220. Specifically, defendants do not object to Striupaitis' testimony concerning the information contained in his report prepared shortly after the shooting. However, defendants argue that once Striupaitis went beyond the information contained in his report and gave conclusions based upon the report, he became an expert retained to testify at trial and the trial court erred in admitting his opinions because plaintiff failed to disclose him as an expert. (Striupaitis' report stated that he failed to find any gunpowder on plaintiff's clothing, but it did not state an opinion as to the distance between plaintiff and the fired weapon.)

Defendants misunderstand the law. The applicability of Rule 220 does not turn upon the substance of the witness' testimony alone. In this case, it is the witness' relationship to the case which controls whether the witness should be disclosed as an expert under Rule 220. (See *Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1992), 154 Ill. 2d 543, 548.) As our supreme court explained in *Wakeford*, the key question is whether the opposing party is likely to be surprised by the witness' testimony:

"If the expert is intimately involved in the underlying facts giving rise to the litigation and he would reasonably be expected to form an opinion through that involvement, then disclosure is not required. In such a case, the opposing party is unlikely to be surprised by the testimony. On the other hand, where the expert's contact with the case is slight, or where the opinion rendered is unrelated to the expert's involvement in the case, then disclosure is required." *Wakeford*, 154 Ill. 2d at 549.

In this case, Striupaitis was brought into the investigation of the shooting by defendants. It was the City which requested that he analyze plaintiff's clothing and conduct tests in order to determine whether gunpowder was present. As a firearms expert, Striupaitis

would reasonably be expected to form an opinion as to the distance between the weapon fired and plaintiff based upon the presence or absence of gunpowder particles. In fact, Striupaitis testified that one of the questions the Rolling Meadows police department wished to resolve when they requested Striupaitis' aid was the distance between Conroy's weapon and the plaintiff. Clearly under these circumstances, defendants cannot claim to be surprised by the substance of Striupaitis' testimony. Therefore, we hold that the trial court did not abuse its discretion in determining that Striupaitis was not subject to the disclosure provisions of Rule 220.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

GORDON, P.J., and MURRAY, J., concur.