DIANE GOVIS LECROY, Indiv. and as Special Adm'r of the Estate of Peter Govis, Deceased, Plaintiff-Appellant, v. ROBERT P. MILLER *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—93—2292

Opinion filed May 30, 1995.

Canel & Hale, Ltd., of Chicago (James H. Canel and Patricia N. Hale, of counsel), for appellant.

Johnson & Bell, Ltd., of Chicago (William V. Johnson, Charles W. Planek, and Thomas H. Fegan, of counsel), for appellees.

JUSTICE McCORMICK delivered the opinion of the court:

Plaintiff, Diane Govis Lecroy, individually and as special administrator of the estate of her deceased husband, Peter Govis, appeals a jury verdict finding defendant, Robert P. Miller, M.D.,[1] not guilty of medical negligence.

On July 20, 1988, Peter Govis died of complications due to lung and liver cancer. Previously, in October 1986, he had been diagnosed with cancer of the larynx and had received a laryngectomy. This litigation arises out of Diane Govis Lecroy's allegations that in January 1986 Dr. Miller negligently failed to biopsy abnormal tissue he had observed in Peter's throat and to develop a follow-up examination plan, thereby delaying the diagnosis of his laryngeal cancer until it had the opportunity to begin metastasizing to his lungs and liver.

In August 1985, Peter Govis was 30 years old. He had begun experiencing hoarseness in his throat. A neighbor referred him to Dr. Stephen Yeh, an otolaryngologist (ENT). Dr. Yeh attempted to examine Peter's throat and vocal cords by mirror, but Peter had a hyperactive gag reflex, which made the exam difficult. Peter gagged and vomited and Dr. Yeh discontinued the exam. Ten days later, on

---

[1]The remaining individual defendants, R.M. Meyer, M.D., and J.M. Campbell, M.D., are named in this lawsuit solely by virtue of their employment with defendant, R.P. Miller, M.D., Ltd., which is Dr. Miller's medical corporation.

August 24, Dr. Yeh had a follow-up appointment with Peter at Evanston Hospital, where he performed an indirect laryngoscopy, which involves the feeding of a fiber-optic device through the patient's nose down into his throat. Dr. Yeh performed this procedure to give himself the view of Peter's vocal cords that he desired, which he had been prevented from seeing through a mirror exam because of Peter's hyperactive gag reflex. Dr. Yeh saw nothing that appeared to be a tumor; however, he noted that Peter had diffuse redness of the larynx. Dr. Yeh attributed this redness to voice abuse—Peter was a truck driver who had to yell in the course of his work—and possibly to exposure to toxic fumes. Dr. Yeh did not take a biopsy of Peter's larynx. He would not have biopsied a diffuse process, such as he viewed in Peter's throat, because he would not have known where to direct the biopsy. According to Dr. Yeh, to biopsy diffuse redness "would be considered frivolous." Dr. Yeh instructed Peter to rest his voice and avoid diesel fumes for about a week.

Peter followed Dr. Yeh's instructions and returned to work; however, the hoarseness persisted. Peter never returned to see Dr. Yeh after the Evanston Hospital visit. Later in the fall, as Peter continued to experience hoarseness and began to experience pain while swallowing hard foods, he visited Dr. Dale, an ENT practicing in Park Ridge, Illinois. Peter saw Dr. Dale on two occasions. Peter reported to Dr. Dale that he had been suffering from hoarseness and that he had also experienced some difficulty swallowing. Dr. Dale attempted a mirror examination during both visits, but Peter experienced his gagging problem. Dr. Dale was not equipped to further examine Peter, so he referred Peter to Dr. Robert Miller, who is also an ENT.

Peter first visited Dr. Miller on December 14, 1985, at his office in Park Ridge. Peter related his hoarseness and swallowing problems to Dr. Miller. Dr. Miller's records for Peter do not indicate that Peter told him that he had seen Dr. Yeh prior to seeing him. Dr. Miller attempted a mirror exam and an indirect laryngoscopy on December 14, but Peter experienced his gagging problem, and Dr. Miller discontinued the exam immediately, noting the hyperactive gag reflex. Dr. Miller determined that he would need to perform a direct laryngoscopy on Peter, which required hospitalization and anesthesia.

Dr. Miller performed the direct laryngoscopy on Peter on January 8, 1986, at Lutheran General Hospital. Diane accompanied Peter to Lutheran General for this procedure. After the procedure, according to Peter's evidence deposition, Dr. Miller told Peter that he had chronic laryngitis and that he did not have cancer. In his exam

report, Dr. Miller recorded that "the supraglottic structures (those above the vocal cords) were noted to have a slightly granular appearance with mild inflammation," a condition Dr. Yeh had not noted in his exam. Dr. Miller also noted mild inflammation of the vocal cords, though "slightly more on the left than on the right." According to Dr. Miller, a granular appearance is not normal and the granular appearance of the supraglottic structures would not account for hoarseness, but the inflamed vocal cords would. Dr. Miller diagnosed chronic laryngitis of unknown etiology. Dr. Miller further stated that laryngitis can be caused by numerous things, including voice abuse, exposure to toxic chemicals and fumes, as well as reflux of stomach acid. Dr. Miller also concluded that there was not a cancerous process in the supraglottic structures.

The primary reason that Dr. Miller performed the direct laryngoscopy was to determine if there was anything he needed to biopsy. Dr. Miller did not biopsy the granular area because there was no specific point that appeared different from the rest, which is the general indicator for biopsy. Without such an area, he would have to guess where to biopsy. According to Dr. Miller, doctors need to focus on some kind of visible lesion for biopsy rather than a general area. The standard of care does not include the performing of random biopsies on the voice box.

Dr. Miller told Peter to rest his voice for a week and to go on a two-week vacation. Dr. Miller directed that a discharge sheet be written. That sheet included a notation that Peter was to return to see Dr. Miller in three weeks. Before he left the hospital, Peter read and signed this form. Peter did not return to see Dr. Miller after January 8, 1986.

Peter followed Dr. Miller's instructions as to voice rest and then resumed his daily routine. Peter saw no doctors regarding his throat between January and August 1986. During that time, his voice progressively worsened, although for a period of between a few weeks, according to Peter's evidence deposition, to almost two months, according to the medical records of Dr. Joyce Schild who subsequently treated Peter, his hoarseness abated. Peter's swallowing problem progressively worsened to the point where Peter had difficulty swallowing soft foods, as well as hard. Peter also developed an earache.

According to Peter's evidence deposition, in September 1986 Peter decided that his problems had persisted too long and he consulted Dr. Schild, an ENT at the University of Illinois in Chicago. Dr. Schild's notes revealed that Peter had experienced hoarseness and right throat and ear pain for a number of months which had abated for $1^{1}/_{2}$ months and then reappeared. Dr. Schild scheduled Peter for

a computerized tomography examination (CT scan). On September 29, 1986, Dr. Schild informed Peter that the CT scan had revealed a mass in Peter's throat, which prompted Dr. Schild to schedule a direct laryngoscopy and biopsy of the mass. As a result of the biopsy, Dr. Schild diagnosed squamous cell carcinoma of the larynx. She scheduled Peter for a laryngectomy, which she performed around October 23, 1986.

Dr. Schild testified that absent the mass revealed by the CT scan, she would not have biopsied Peter's throat because random biopsies of the larynx are not generally done. Rather, a doctor looks for a specific area of abnormality. Dr. Schild stated that granular tissue and mild inflammation without more were not an indicator to perform a biopsy. According to Dr. Schild, Peter's swallowing difficulty was not cancer related. Dr. Schild further explained that laryngeal tumors are classified on a scale using the letters T, N, and M, where T0 through T4 indicates the increasing size of the tumor, N0 through N3 represents whether the tumor has invaded the adjacent lymph nodes, and M0 and up indicates the extent to which the tumor has metastasized to other areas of the body. Dr. Schild's examination of Peter's larynx revealed that Peter had a T4,N0,M0 tumor, meaning it was a large tumor that had not spread beyond the larynx. Based on this scale, Dr. Schild estimated Peter's chance of survival at 50% to 65%. Dr. Schild could not conclude how long Peter's tumor had been present.

After the laryngectomy, Peter underwent radiation therapy to destroy any remaining cancer in his throat and to prevent nodal cancer in his neck. As a result of the laryngectomy, Peter lost the use of his voice and underwent a tracheostomy to enable him to breathe through a hole in his neck. After completing radiation therapy, around March 1987, Peter returned to work part-time, and then full-time in May 1987. Peter stopped working on October 23, 1987, due to an injury unrelated to his cancer. He was scheduled to return to work on January 28, 1988. However, in late December, after a routine chest X ray, Dr. Schild discovered a spot on Peter's lung, which was later diagnosed as squamous cell carcinoma. The initial diagnosis was that the cancer had metastasized from the larynx; however, it could also have been a second primary tumor. By March 1988, two additional tumors had been diagnosed in Peter's liver. These were definitely the result of metastasis from either the larynx or the lung because squamous cells do not exist independently in the liver. Peter died on July 20, 1988.

Dr. Edward Weisberger testified as an expert on behalf of plaintiff Diane Govis Lecroy. Having reviewed only Dr. Miller's written find-

ings, he asserted that Peter's laryngeal tumor was present in its early stages on January 8, 1986. Dr. Weisberger further asserted that Dr. Miller violated the standard of care on January 8, 1986, by failing to biopsy the granular tissue in Peter's throat when he had the opportunity during the direct laryngoscopy. According to Dr. Weisberger, this failure caused a delay in the diagnosis of Peter's cancer, contributing to his death. Dr. Weisberger conceded, however, that had Peter returned to see Dr. Miller three weeks later and had Dr. Miller biopsied Peter then, Dr. Miller would have been within the standard of care. Dr. Weisberger also stated that Dr. Miller violated the standard of care by failing to develop a proper follow-up plan for Peter. However, at the time prior to trial when he formed his opinions in preparation for this case, Dr. Weisberger was unaware that Peter Govis signed a form upon discharge from Lutheran General Hospital instructing him to see Dr. Miller in three weeks.

Dr. Michael Kaufman, a pathologist and an expert in "flow cytometry," a method of estimating the growth rate of tumors, testified on behalf of Dr. Miller about the nature of Peter's laryngeal tumor. Dr. Kaufman stated that Peter Govis' tumor was likely present on January 8, 1986, in microscopic submucosal form, not diagnosable by random biopsy of a generally inflamed throat. Dr. Kaufman believed that Peter's tumor was very aggressive, which would account for its fast progression between January and October 1986. Dr. Kaufman also believed that the slightly granular appearance of Peter's left vocal cord was unrelated to the tumor on the right vocal cord because the inflammation in the left cord was present, in the same form as reported by Dr. Miller, after the laryngectomy. According to Dr. Kaufman, a generalized granular appearance is not indicative of a tumor. The fact that Peter's hoarseness improved for a while supported Dr. Miller's conclusions because cancer-related hoarseness does not improve or abate for weeks at a time. Finally, Dr. Kaufman stated that the cancer in Peter's liver and lung probably had metastasized from his larynx. However, Dr. Kaufman further stated that despite Peter's lack of risk factors for laryngeal cancer, he nonetheless developed it and, therefore, "it *** [was] certainly quite possible that *** [Peter developed] another tumor in his lung" and that that tumor was the one that metastasized to his liver.

Dr. John Stankiewicz also testified as an ENT expert on behalf of Dr. Miller. Dr. Stankiewicz stated that Dr. Miller's instruction to Peter to return in three weeks complied with the standard of care and that the discharge sheets, like the one signed by Peter, are an appropriate manner in which to tell a patient to return for a follow-up. Dr. Stankiewicz further stated that Dr. Miller did not violate the

standard of care on January 8, 1986, because in order to take a biopsy, a doctor needs a specific lesion from which to take tissue, rather than a diffuse process such as a general granular appearance of an entire area. Small tumors, of the size possibly present in Peter's throat in January 1986, do not cause diffuse granularity throughout the supraglottic structure. Dr. Stankiewicz further stated that the report of the CT scan performed in October 1986 revealed that Peter's tumor was submucosal, meaning it was below a mucous membrane. Such tumors are difficult to visualize and biopsy because the biopsy does not go deep enough to obtain any tumorous tissue. According to Dr. Stankiewicz, ENTs are not required to, and do not, perform biopsies of unsuspicious tissue.

Dr. Stankiewicz also agreed with Dr. Kaufman's assessment that Peter's tumor was a very aggressive one, as is usually the case in patients as youthful as Peter. Dr. Stankiewicz believed that Peter's tumor was not present in January 1986 because of Peter's symptom-free period in the summer of 1986. Symptoms of an ongoing and progressing cancer do not disappear. Although the granularity Peter experienced could have been caused by cancer, it could also have been caused by the factors testified to by Dr. Miller. Had the granularity been restricted to a single area, it would have been a suspicious tissue, but as a diffuse process, it was not.

Based on the foregoing evidence, the jury found in favor of Dr. Miller.

Plaintiff claims that the trial court committed reversible error in failing to properly sustain an objection to defense counsel's misrepresentation of the testimony of Drs. Schild and Yeh. Both doctors testified as treating physicians and, therefore, neither testified as to the standard of care in this case. However, both gave testimony to the effect that diffuse granularity and mild inflammation did not require a random biopsy of the throat absent a specific indication of a tumor. Plaintiff contends that during closing argument, defense counsel improperly argued that Dr. Schild gave standard of care testimony:

"MR. JOHNSON: Now, Mr. Canel said to you that Doctor Schild did not give standard of care testimony. I suggest you—I would ask that you look at your notes. She did.

MR. CANEL: Objection.

THE COURT: Susta'—with regard to the objection, any statement made by a lawyer that is not based on the evidence should be disregarded by you. You should use your own recollection of the evidence. Again, I remind you that what the lawyers say during closing arguments is not evidence.

MR. JOHNSON: I submit to you that I specifically asked Doctor

Schild that if in her opinion the standard required a biopsy of the diffuse granular tissue—

MR. CANEL: Objection, your Honor.

MR. JOHNSON: *** [S]he said no.

MR. CANEL: Objection, your honor.

MR. JOHNSON: That's the testimony."

Without using the word "sustained," the court repeated the admonishment about counsel's argument. Shortly thereafter, defense counsel argued with regard to Dr. Yeh's testimony:

"MR. JOHNSON: *** With regard to what Doctor Yeh said, Counsel said that Doctor Yeh didn't give standard of care testimony. He specifically did not.

*** And I said, well, Doctor Yeh, you saw a diffuse inflammatory process. Why didn't you biopsy? And *** he said, well, that would be frivolous.

Now you can take that to mean standard of care or not—

MR. CANEL: Objection, your honor.

MR. JOHNSON: (Continuing)—but I would submit to you that it is clear—

THE COURT: Overruled.

MR. JOHNSON: (Continuing)—that Doctor Yeh gave testimony that you don't biopsy a diffuse process because there is nothing to raise a doctor's suspicion and there is nothing to biopsy. And his specific term was that would be frivolous."

Plaintiff contends that these statements by defense counsel prejudiced the trial to an extent that reversal is required.

■■ Counsel is entitled to vigorously argue his client's case and draw all reasonable inferences from the evidence. (*Poole v. City of Rolling Meadows* (1993), 253 Ill. App. 3d 154, 161, 627 N.E.2d 1112.) However, counsel may not misrepresent the evidence, argue facts not in evidence, or "create his own evidence." (*Poole*, 253 Ill. App. 3d at 161.) Nonetheless, when a trial court sustains an objection to improper remarks of counsel and admonishes the jury that counsel's remarks are not evidence, any error is cured. (*Atwood v. Chicago Transit Authority* (1993), 253 Ill. App. 2d 1, 14, 624 N.E.2d 1180.) Even if the trial court does not rule on the objection, but rather merely instructs the jurors that they should rely on their own memories of the evidence, error has been considered cured. (*McCray v. Shams* (1992), 224 Ill. App. 3d 999, 1006, 587 N.E.2d 66.) Finally, in reviewing allegations of misconduct by counsel in presenting closing argument, this court will generally affirm the judgment of the trial court unless the complaining party has been substantially prejudiced by the comments of counsel. (*Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 454, 501 N.E.2d 830.) Thus, "if the trial

was fair as a whole and the evidence was sufficient to support the jury's verdict, a case will not be reversed upon review." *Bresland*, 150 Ill. App. 3d at 454.

■ Given that "standard of care" in a medical malpractice case is a term of art, counsel's characterization of Dr. Schild's and Dr. Yeh's testimony misrepresented somewhat the precise legal consequence of their testimony. Nonetheless, counsel did not misstate the substance of the testimony. Dr. Schild and Dr. Yeh testified that faced with the diffuse process viewed by Dr. Miller, they would not biopsy. Furthermore, the trial court's admonition cured any error in counsel's statements about Dr. Schild's testimony and counsel himself acknowledged that Dr. Yeh did not testify as to standard of care.

Additionally, our review of the record in this case reveals that the evidence was not closely balanced, which renders any error non-prejudicial. (*Mazurek v. Crossley Construction Co.* (1991), 220 Ill. App. 3d 416, 427, 581 N.E.2d 89.) Indeed, we believe a jury would have been hard pressed to find for plaintiff. Even plaintiff's expert, Dr. Weisberger, admitted that had Peter returned to see Dr. Miller, as instructed, and had Dr. Miller subsequently diagnosed cancer, Dr. Miller would not have violated any standards of care. The fact is that Dr. Weisberger's testimony, that a doctor should perform random biopsies simply because the patient is under direct laryngoscopy, was overwhelmed by the testimony of every other medical professional who testified, regardless of whether that testimony was couched in terms of "standard of care" language. For that reason, to the extent counsel's remarks were improper, prejudice is lacking because the evidence was more than sufficient to support the verdict. *Bresland*, 150 Ill. App. 3d at 454; see also *Mazurek*, 220 Ill. App. 3d at 427.

■ Plaintiff also contends that the trial judge erred in admonishing the jury prior to Dr. Weisberger's testimony as follows:

> "I am allowing the witness to testify to certain medical reports, records, photographs and depositions that have not been admitted in evidence as testimony. It's allowed for a limited purpose and it is allowed so that the witness may tell you what he relied on to form his opinion."

Despite the fact that the trial judge admonished the jury in like fashion prior to the testimony of each expert witness, and despite the fact that, in light of *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, our courts have both encouraged and approved such admonitions (*e.g.*, *People v. Anderson* (1986), 113 Ill. 2d 1, 12, 495 N.E.2d 485; *Mayer v. Baisier* (1986), 147 Ill. App. 3d 150, 157-58, 497 N.E.2d 827; *Henry v. Brenner* (1985), 138 Ill. App. 3d 609, 615, 486 N.E.2d 934), plaintiff argues that in this case, because some of the records Dr.

Weisberger reviewed were admitted into evidence, the admonition misled the jury into not considering those records. We believe the trial court's use of the word "certain" to modify "medical reports, records, photographs and depositions" renders proper the admonition in that it implies that some reports were to be admitted into evidence.

Furthermore, to the extent that plaintiff's counsel maintained reservations about the substance of the admonition, he never raised his concerns with the trial court until he filed his post-trial motion. Thus, the trial judge never had the opportunity to clarify his admonition. We consider this failure a waiver of any further consideration of this issue for appeal. (*Bresland*, 150 Ill. App. 3d at 453.) This result is particularly apt here because every expert relied on the same photos and records and the trial judge gave the same allegedly faulty admonition each time. Certainly, during the numerous sidebars and in-chambers discussions, counsel could have requested that the court clarify the admonition. Plaintiff's claim that no opportunity existed to correct this "error" is rather disingenuous.

Plaintiff further contends that the trial court erred in admitting into evidence Peter's discharge record from Lutheran General Hospital. The record was prepared on January 8, 1986, after Dr. Miller performed the direct laryngoscopy on Peter. Dr. Miller used this record to establish that he had instructed Peter to return to see him three weeks after the laryngectomy. Plaintiff argues that Dr. Miller failed to lay a proper foundation for the admission of this record.

■ Trial in this case was held in 1993. In 1992, Supreme Court Rule 236 (134 Ill. 2d R. 236) was amended to include hospital records as business records admissible in a civil proceeding, so long as a party establishes a proper foundation for their admission. Rule 236(a) requires only that the document be "made in the regular course of any business, and [that] it was the regular course of the business to make such a *** record at the time of [the event] or within a reasonable time thereafter." 145 Ill. 2d R. 236(a).

■ Here, Dr. Miller testified that he, a nurse, and the anesthesiologist prepared the document in conjunction with his treatment of Peter. Dr. Miller also stated that discharge sheets for surgery patients are prepared by the attending nurse, who memorializes the instructions of the anesthesiologist and the physician. Plaintiff contends that because Dr. Miller did not personally prepare the document, she was unable to cross-examine the declarant. However, Rule 236 states that "[a]ll other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker,

may be shown to affect its weight, but shall not affect its admissibility." (145 Ill. 2d R. 236(a).) Our courts have held that a witness may produce business records for admission into evidence even though he is not the original entrant as long as the records are made in the course of business, he is familiar with the records sought to be admitted, and acquainted with the business and procedures at issue. (*Ford Motor Credit Co. v. Neiser* (1990), 196 Ill. App. 3d 515, 517, 554 N.E.2d 322; *Thomas v. Police Board* (1980), 90 Ill. App. 3d 1101, 1105, 414 N.E.2d 11.) The trial court did not err in admitting the discharge record.

■ Plaintiff characterizes her fourth claim of error as one involving the defense's failure to complete impeachment of Dr. Weisberger. One of the allegations in the complaint was that Dr. Miller did not formulate an adequate follow-up plan after the direct laryngoscopy. The defense theory on this claim was that Peter chose not to return to Dr. Miller even though Dr. Miller had instructed him in the discharge sheet to return in three weeks. During cross-examination of Dr. Weisberger, defense counsel attempted to elicit an admission that at the time Dr. Weisberger had formed his opinion that Dr. Miller had not formulated a follow-up plan, he had not been aware that Peter had received instructions from Dr. Miller, in the discharge sheet, to return in three weeks. Dr. Weisberger admitted that he had not been aware of the discharge slip at the time.

First, this is not an impeachment issue. Defense counsel's strategy was to undercut the credibility of Dr. Weisberger by showing that he did not have all the pertinent information when he arrived at his opinion in the case. Plaintiff's case citations, particularly *Mazurek*, are unhelpful, as they deal with situations in which counsel failed to establish prior inconsistent statements after implying that such statements had been made. Here, defense counsel was not trying to establish a prior inconsistent statement. Rather, he was merely testing the credibility of the expert's opinions. No error occurred in the line of questioning at issue.

■ Plaintiff also challenges the trial court's decision permitting Dr. Miller to answer hypothetical questions about how he could have treated Peter had Peter returned to see him. Plaintiff argues that because an expert witness cannot base his opinion on speculation (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 246, 500 N.E.2d 8), and because "[t]here must be an evidentiary basis for each element included in a hypothetical question" (*Tomaszewski v. Godbole* (1988), 174 Ill. App. 3d 629, 638, 529 N.E.2d 8), Dr. Miller's testimony was inadmissible because no other medical witness testified that Peter could be adequately examined in an office visit. Dr. Miller counters

that (1) his testimony that he could adequately monitor Peter in the office established the evidentiary basis to support the posing of the hypothetical, and (2) such testimony was necessary to rebut Dr. Weisberger's opinion that because of Peter's hyperactive gag reflex, mere follow-up office visits constituted an inadequate follow-up treatment plan.

This issue arose because the hospital discharge sheet signed by Peter undermined plaintiff's allegation that Dr. Miller did not create a proper follow-up plan for Peter. To counter the discharge sheet, which established that Peter ignored Dr. Miller's instruction to return in three weeks, plaintiff called Dr. Weisberger to elicit his opinion that an office visit constituted an inadequate follow-up. Dr. Miller then testified that the direct laryngoscopy had provided a baseline from which he could monitor Peter in the future. Counsel attempted to follow this statement with questions as to Dr. Miller's ability to do that monitoring in his office using indirect laryngoscopy. The trial court had initially excluded the testimony as too speculative; however, the court permitted counsel to rephrase his question in the form of a hypothetical. Thus, Dr. Miller testified that assuming Peter's symptoms had remained the same or had even worsened, he would have been able to sufficiently monitor Peter in the office using indirect laryngoscopy despite Peter's hyperactive gag reflex.

We believe that to have excluded this testimony would have been to prevent Dr. Miller from presenting any defense to the failure to follow-up allegation. Also, we fail to discern how Dr. Miller's request that Peter return to see him could constitute an inadequate follow-up plan. At the time Dr. Miller requested Peter to return, Peter was a new patient. Dr. Miller's request that Peter return for an office visit did not forever cast in stone any and all treatment options available had Peter actually returned to see him. The fact is that Peter did not return to Dr. Miller. We believe that the real speculation in this case is plaintiff's surmising as to what limitations Dr. Miller would have placed on his treatment of Peter had he visited Dr. Miller again.

Finally, plaintiff claims that the cumulative errors warrant a new trial. As this opinion indicates, there was no substantial error below. *Glassman v. St. Joseph Hospital* (1994), 259 Ill. App. 3d 730, 765, 631 N.E.2d 1186.

Affirmed.

SCARIANO, P.J., and HARTMAN, J., concur.