IRENE FISHER, Indiv. and as Adm'r of the Estate of Walter Fisher, Deceased, Plaintiff-Appellant, v. FRED SLAGER *et al.*, Defendants-Appellees.

First District (3rd Division) No. 1—87—3066

Opinion filed July 11, 1990.—Rehearing denied August 14, 1990.

Michael J. Radtke, of Goldberg & Goldberg, and David A. Novoselsky &

Associates, both of Chicago (David A. Novoselsky and Kathleen M. Krist, of counsel), for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, John W. Dondanville, Michael A. Pollard, and Kathleen F. MacLennan, of counsel), for appellee M. Norton Flanagan.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (John G. Langhenry, Jr., Robert H. Smith, and Lynn D. Dowd, of counsel), for appellee Timothy Scarff.

Johnson, Cusack & Bell, of Chicago (Thomas H. Fegan, Donald N. Hoppe, and Charles W. Planek, of counsel), for appellees Richard J. Fiedler, Kyung Koo, and Elgin Internal Medicine Associates, Inc.

Lord, Bissell & Brook, of Chicago (Williams P. Dorr, Hugh C. Griffin, and Diane I. Jennings, of counsel), for appellees Douglas Anderson and Foster G. McGaw Hospital, Loyola University of Chicago.

O'Connor & Schiff, of Chicago (Elliot R. Schiff and Neil D. O'Connor, of counsel), for appellee Sherman Hospital.

Pretzel & Stouffer, of Chicago (Robert Marc Chemers, Paul L. Price, and Michael G. Bruton, of counsel), for appellees A. Beaumont Johnson II and James B. Mansfield.

Wildman, Harrold, Allen & Dixon, of Chicago (John M. Stalmack, Ruth E. Van DeMark, and Gregory S. Norrod, of counsel), for appellee Fred Slager.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Irene Fisher, individually and as administrator of the estate of Walter Fisher, deceased (Fisher), brought wrongful death and survival actions against 11 defendants, including Dr. Fred Slager; Dr. M. Norton Flanagan; Foster G. McGaw Hospital, Loyola University of Chicago (Loyola); Dr. Douglas Anderson; Dr. Timothy Scarff; Sherman Hospital; Dr. Richard J. Fiedler; Dr. Kyung Koo; Elgin Internal Medicine Associates; Dr. A. Beaumont Johnson II; and Dr. James B. Mansfield. Plaintiff alleged that the defendants negligently treated Fisher from the time that he suffered a massive brain hemorrhage until his death from a brain abscess over 14 months later. Specifically, plaintiff alleged that the defendants negligently failed to diagnose and

treat the brain abscess. After a six-week trial, a jury returned a verdict in favor of all defendants and against the plaintiff, and the trial court entered judgment on the verdict. Plaintiff's post-trial motion was denied and this appeal ensued. On appeal, plaintiff contends that the trial court erred in giving the jury IPI No. 105.08 (Illinois Pattern Jury Instruction, Civil, No. 105.08 (2d ed. 1971)(IPI Civil 2d)) and that the defendants' closing arguments were prejudicial. We affirm.

On April 9, 1981, Fisher suffered a massive brain hemorrhage which caused a severe stroke. He was admitted to Loyola for treatment. Dr. Timothy Scarff, a neurosurgeon, treated Fisher at Loyola from April 10, 1981, until Fisher's transfer to Sherman Hospital on May 13, 1981. When Fisher was admitted to Loyola, he was in a deep coma, had significant weakness on his left side and responded poorly to painful stimuli. Based upon CAT scans taken on April 9 and 10, 1981, Dr. Scarff determined that Fisher had a large blood clot, occupying one-third to one-half of the right portion of his brain. The most likely cause of the clot was severe, uncontrolled hypertension. The clot pushed Fisher's brain structures to the left, compromising neurological function. On April 10, 1981, given this life-threatening condition, Dr. Scarff treated Fisher by placing a catheter directly into the affected area to drain the fluid, relieve intracranial pressure and to monitor brain swelling.

Between April 10 and 18, 1981, Fisher developed bacterial pneumonia. The development of infection is a complication of implantation of a catheter, with an increased risk of infection when a catheter is in place for more than 8 to 10 days. Dr. Scarff removed the catheter, and on April 18, 1981, assisted by Dr. Douglas Anderson, performed a craniotomy to remove the blood clot.

On April 22, 1981, Fisher displayed signs of infection and cultures were taken. Dr. Scarff consulted with Dr. O'Keefe, an infectious disease specialist. Based on that consultation, Dr. Scarff prescribed intraventricular and intravenous antibiotic treatment which included ampicillin, gentamicin and clindamycin. It is undisputed that the infection was a natural complication of Fisher's condition and the treatment given, and not the result of negligence.

In Dr. Scarff's opinion, seven days of antibiotic treatment would have been sufficient because the cultures of Fisher's cerebral spinal fluid on April 29, 1981, indicated that the infecting organism was gone. In accordance with Dr. O'Keefe's opinion, however, Dr. Scarff ordered the administration of antibiotics for two weeks. Fisher received antibiotic treatment until May 10, 1981. After April 29, Fisher's cerebral fluid was monitored on a daily basis and all of the cul-

tures were negative for the presence of infectious organisms.

In Dr. Scarff's opinion, Fisher did not have cerebritis (infection of the brain tissue), fulminating ventriculitis (a virulent infection of the fluid in the ventricles of the brain) or a brain abscess (an encapsulated pocket of infection) while a patient at Loyola or at the time of his discharge. According to Dr. Scarff, given the type of bacterial infection, it would have been impossible for Fisher to have had an ongoing infection and still produce cultures which were negative for the presence of infectious organisms.

Dr. Anderson similarly testified that the infection was successfully treated and that Fisher did not have ventriculitis, cerebritis, or a brain abscess on May 13, 1981, when he was transferred from Loyola to Sherman Hospital at the request of the Fisher family. Both Dr. Anderson and Dr. Scarff explained that if ventriculitis had been present and untreated at that time, Fisher would have suffered neurological deterioration and death within a few days or weeks.

According to Dr. Scarff, after the craniotomy, CAT scans taken on April 21 and 24 revealed a reduction in swelling in Fisher's brain. An April 29, 1981, CAT scan was normal for a post-operative patient, and indicated a resolving blood clot, an improvement in the shifting of the brain structures and the healing process. Given Fisher's post-operative condition, no further CAT scans were taken at Loyola after April 29, 1981. On May 13, 1981, Fisher was transferred to Sherman Hospital.

At Sherman Hospital, Dr. Beaumont Johnson II, a neurosurgeon, assumed responsibility for Fisher's neurological care. Upon his admission to Sherman Hospital, Dr. Richard J. Fiedler examined Fisher, as his attending physician. Dr. Fiedler was an internist with Elgin Internal Medical Associates, as were Dr. Fred Slager and Dr. Kyung Koo, who also participated in Fisher's care.

Prior to Fisher's admission, Dr. Fiedler spoke with Dr. Johnson and Dr. James B. Mansfield for neurosurgical consultations. At the time of admission, Fisher continued to suffer from hypertension, paralysis of his left side and received blood pressure medication and nutrition through hyperalimentation. Dr. Johnson reviewed the April 29, 1981, CAT scan and was satisfied with Fisher's stage of recovery.

On May 14, 1981, a sputum culture was taken and revealed the presence of proteus morabilis and pseudomonas. Dr. Fiedler prescribed an antibiotic, Keflex, and ordered additional cultures on May 16, 1981. A cerebral spinal fluid culture revealed the presence of proteus morabilis. Dr. Koo ordered Fisher transferred to the intensive care unit on May 20, 1981, because of his pulmonary and other prob-

lems. A CAT scan was also ordered. By May 28, 1981, the pulmonary infection or pneumonia had stabilized.

CAT scans performed on May 20, 1981, and June 10, 1981, disclosed abnormalities which Dr. Mansfield and Dr. Johnson interpreted as evidence of a resolving hematoma. Dr. Heenahan, a radiologist, interpreted the CAT scans and rendered a diagnosis of a brain abscess or a resolving hematoma. Initially, Dr. Mansfield believed that either condition was a possibility. As of June 13, 1981, however, Dr. Mansfield concluded that Fisher did not have a brain abscess because the lesion was decreasing in size and a brain abscess would have increased in size. From May 20, 1981, until June 10, 1981, the lesion decreased from 76 millimeters to 56 millimeters and the shifting of brain structures decreased from 12 to 8 millimeters. Dr. Johnson concurred that the condition was a resolving hematoma since the lesion was shrinking.

Dr. Mansfield testified that clinical improvements expected to occur during a resolving hematoma included a level of consciousness, responsiveness and improved speech. Fisher displayed continued improvement from May 31, 1981, until his discharge on July 7, 1981. On May 31, 1981, Fisher opened his eyes but was essentially semicomatose. Fisher became more alert, was able to nod his head and move his right side, and had increased muscle tone, such that he could sit in a chair by June 17, 1981. From June to September, Fisher's speech improved such that he progressed from speaking only a few words to engaging in excellent conversation.

Based upon this clinical improvement, which was inconsistent with the presence of an abscess, Dr. Mansfield decided not to aspirate the contents of Fisher's lesion to determine if the contents comprised an abscess. Aspiration would involve the insertion of a needle through healthy brain tissue in order to reach the lesion.

Prior to Fisher's July 1981 discharge from Sherman Hospital, Dr. Flanagan, a board-certified physiatrist who rehabilitated patients, recommended continued, intensive therapy. The family refused to admit Fisher to a rehabilitation facility and selected an out-patient, home-therapy plan. Dr. Flanagan did not control the plan, although Sherman Hospital's therapy staff was utilized.

On August 22, 1981, the Fisher family reported to Dr. Flanagan that Fisher's functional abilities had not improved since his discharge. Dr. Flanagan again recommended that Fisher be admitted to an inpatient therapy group. Fisher continued with the out-patient plan and missed 50% of his therapy appointments due to his elevated blood pressure. Dr. Flanagan supervised Fisher's out-patient therapy and

assessed his progress until April 1982.

Fisher developed a reddened area around the scar from the craniotomy and drainage from that area. Dr. Johnson ordered a culture of the draining fluid, which showed the presence of poteus morabilis. Dr. Johnson recommended that the scalp wound be revised within the week and that, if necessary, the flap of bone which was removed to do the craniotomy be replaced with a plastic or metal plate. Mrs. Fisher did not want the surgical revision performed and consulted with Dr. Scarff for a second opinion on September 12, 1981.

Dr. Scarff ordered skull X rays, and based on those X rays determined that neither the skull nor the bone flap was infected. The radiology report stated that there was no evidence of infection at the surgical site. According to Dr. Scarff, the bone flap was positioned where it had been after surgery. Had there been an abscess present, the bone flap would have been pushed out by the inflammation. Dr. Scarff advised Fisher to return to Dr. Johnson and follow his recommendations and that it was appropriate to treat the area with antibiotics. The scalp revision that had been advised by Dr. Johnson was never performed. Fisher went to Dr. Fiedler, who treated Fisher's head injury with antibiotics.

In September and October 1981, Fisher experienced seizures and the seizures recurred after the family discontinued administering his seizure medication because it made him drowsy. The medication was changed and there were no further significant seizures.

From September 1981 through May 1982, Fisher received a variety of medications and antibiotics under Dr. Fiedler's supervision. Fisher suffered from a number of serious disease processes, including kidney disease, diabetes and hypertension. On June 5, 1982, Fisher became unresponsive and Dr. Fiedler instructed the family to bring him to the hospital. Fisher was unresponsive to pain and his blood pressure was elevated to 198 over 110. Dr. Fiedler consulted a neurosurgeon and an infectious disease specialist, and ordered a CAT scan, which revealed the presence of a brain abscess.

June 5, 1982, Dr. Chung performed surgery to drain the abscess. A culture revealed the presence of two bacteria, staph aureas and proteus morabilis. Again, on June 19, 1982, Dr. Chung operated to drain the abscess. Fisher died on June 22, 1982, of cardiac arrest caused by the brain abscess. Dr. Chung's surgical report stated, and plaintiff's expert witness, Dr. Robert Geller, agreed, that Fisher did not suffer from an infection of the bone flap.

Dr. Geller opined that each of the doctors who were named as defendants deviated from the standard of care in failing to diagnose

the presence of a brain abscess prior to June 5, 1982. Yet, Dr. Geller could not determine whether Fisher had clinical signs of symptoms of a brain abscess during his initial hospitalization at Sherman Hospital and conceded that the abscess could have developed later from an infection in Fisher's urine, lung, or skin which had been carried to his brain via his blood stream.

Plaintiff's other expert witness, Dr. Alan Levin, testified that the CAT scan taken at Loyola on April 29, 1981, did not reveal an abscess. According to Dr. Levin, as late as May 20, 1981, the presence of a brain abscess could not have been diagnosed from the CAT scan alone, but the doctors would have to have been able to "look into the future" at that point to diagnose the brain abscess. Dr. Levin acknowledged that Fisher did not have any of the classic symptoms of brain abscess, such as vomiting and headaches, until shortly before he was readmitted to Sherman Hospital on June 5, 1982.

Defendants' experts, Dr. Michael Jerva, chief of neurosurgery at Mercy Hospital, Dr. Hector James, a pediatric neurosurgeon, Dr. Glenn Dobben, a neuroradiologist, Dr. Richard Stalzer, a specialist in internal medicine, and Dr. Stuart Levin, an infectious disease specialist, testified that the management and treatment of Fisher's medical condition was within the standard of care and did not cause or contribute to his death in any manner. Specifically, they testified that the timing and number of scans taken were appropriate and within the standard of care, and that Fisher's transfer to and discharge from Sherman Hospital were appropriate. Additionally, the antibiotics selected, the dosage and method of administration, as well as the management of his care in 1982 were all within the proper standard of care.

In summary, defendant's experts opined that Fisher did not have a brain abscess until shortly before he arrived at Sherman Hospital on June 5, 1982, and that the drainage from the scalp wound was not a symptom of a brain abscess. Their opinions were based in part on the fact that it was not possible for a brain abscess to remain in a patient for a year without manifestation of clinical signs or symptoms because a brain abscess is a very rapidly progressing condition which, if left untreated, would result in death in a matter of days or weeks.

We first address plaintiff's contentions in the trial court and on appeal relating to the trial court giving the jury IPI Civil 2d No. 105.08. The instruction states;

"A patient is required to follow [the doctor's] reasonable advice as to treatment. In addition, he must follow the doctor's post-operative treatment [and] instructions. A doctor is not liable for

the consequences of a patient's failure to do so. A patient's failure to receive treatment or follow instructions does not absolve the doctor from the results of any earlier malpractice. It only absolves him from any injury caused by the patient's not accepting reasonable treatment or following instructions."

At the conference on instructions, plaintiff made only the following objection when IPI Civil 2d No. 105.08 was tendered:

"I don't believe that the evidence supports the giving of that instruction. I think that plaintiff-Fisher did follow all instructions that were given."

The trial judge overruled plaintiff's objection and stated, "I think that there is testimony in the record concerning the advice of Dr. Johnson and the lack of the followup by the patient, so that issue is something for the jury to consider."

The record clearly supports the trial court's conclusion. There is evidence that Fisher failed to undergo a scalp revision as advised by Dr. Johnson. There is also evidence that prior to Fisher's hospital discharge on July 7, 1981, Dr. Flanagan recommended continued intensive therapy as an in-patient. Fisher, however, was not admitted in a rehabilitation facility but, instead, he began a home-therapy plan which was managed on an out-patient basis. There is evidence that the home-therapy plan utilized between August 8, 1981, and August 22, 1981, was not the best mode of rehabilitation. On August 22, 1981, Fisher's family returned to see Dr. Flanagan because they believed that Fisher's functional abilities had not improved since his discharge. Dr. Flanagan again recommended that Fisher be admitted to an inpatient therapy program, but this advice was not followed. Instead, Fisher continued with an out-patient program. The out-patient plan required treatment no fewer than three days a week and ideally five days a week. Fisher, however, missed approximately 50% of his therapy appointments. A physical therapist who treated Fisher testified that missing approximately 50% of the therapy treatments can interrupt the continuity of treatment and hinder the patient's progress. A medical expert witness testified that missing approximately 50% of the prescribed therapy treatments was not in the patient's best interest.

■ Under the circumstances, we conclude that at the conference on instructions, the trial court properly overruled the plaintiff's objection that IPI Civil 2d No. 105.08 should not have been given to the jury because there was no evidence to support the giving of the instruction. There clearly was sufficient evidence to support the instruction.

On appeal, plaintiff argues that there was no evidence that Fisher's failure to undergo a scalp revision or his failure to follow the medically advised rehabilitation program was a proximate cause of Fisher's death and that, therefore, IPI Civil 2d No. 105.08 should not have been given to the jury. We disagree.

Plaintiff's argument ignores the fact that this case is not merely a wrongful death action. It is also a survival action, for which the plaintiff asked the jury to award substantial damages because "during the last year of his life" Fisher's physical abilities did not improve and because he did not "achieve his potential" and because he suffered pain. We believe that there was sufficient evidence from which the jury could have found, had it reached the issue, that the damages claimed in the survival action resulted in whole or part from Fisher's rejection of Dr. Johnson's advise and Fisher's failure to follow the medically advised rehabilitation plan which was prescribed for him. We therefore conclude that the plaintiff's argument that IPI Civil 2d No. 105.08 should not have been given to the jury because there was no evidence that either of the above propositions was a proximate cause of Fisher's death is untenable. Both propositions relate to the damages sought and legitimate factual issues in the survival action.

In her post-trial motion, plaintiff contended that giving the jury IPI Civil 2d No. 105.08 was improper because "[t]here was no instruction as to comparative fault tendered to the jury in the issue instruction." Plaintiff did not identify which specific so-called comparative fault instruction should have been given to the jury. In her brief on appeal, however, plaintiff argues that since IPI Civil 2d No. 105.08 is a damage-reducing instruction, the trial court should have given the jury IPI Civil 2d No. 45.07 (3d ed. 1990) in conjunction with IPI Civil 2d No. 105.08. IPI Civil 3d No. 45.07 reads as follows:

"We, the jury, find for ＿＿＿＿＿ [on ＿＿＿＿＿'s (complaint) (counterclaim)] and against [＿＿＿＿＿.] [the following defendants:

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿.]

We further find the following:

First: Without taking into consideration the question of reduction of damages due to the negligence of the plaintiff [if any], we find that the total amount of damages suffered by the plaintiff as a proximate result of the occurrence in question is $＿＿＿＿[.] [, itemized as follows:]

Second: Assuming that 100% represents the total combined negligence of all persons whose negligence proximately contrib-

uted to the plaintiff's [injury] [or] [damage], including the plaintiff[,] [and] the defendant[s we have found liable,] [and all other persons], we find that the percentage of such negligence attributable solely to the plaintiff is _____ percent (%).

Third: After reducing the total damages sustained by the plaintiff by the percentage of negligence attributable solely to the plaintiff, we assess the plaintiff's recoverable damages in the sum of $_____.

[Signature Lines]"

■■ The manifest fault in plaintiff's argument is that the plaintiff herself tendered the general verdict forms that were given to the jury, and she never tendered IPI Civil 3d No. 45.07, or any comparative negligence issue instruction, to the trial court. She therefore can not now be heard to complain that the trial court should have given the jury IPI Civil 3d No. 45.07 or a comparative negligence issue instruction. *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 550, 475 N.E.2d 817, 821; *McKinney v. Coca Cola Bottling Co.* (1988), 170 Ill. App. 3d 362, 363, 524 N.E.2d 657, 658; 107 Ill. 2d R. 366 (b)(2)(i).

■■ Moreover, plaintiff concedes that IPI Civil 2d No. 105.08 is solely a damage-reducing instruction and IPI Civil 3d No. 45.07 is a damage-reducing verdict form as opposed to a general verdict form. Since the jury found all 11 defendants not liable, the giving of IPI Civil 2d No. 105.08 and the failure to give IPI Civil 3d No. 45.07 would only be a nugatory error, if it were error. This is made plain by the fact that the jury was given IPI Civil 3d 36.01. The IPI Civil 3d No. 36.01 instruction that was given to the jury reads as follows:

"If you decide for one or more of the defendants on the question of liability, you will have no occasion to consider the question of damages as to that defendant or those defendants."

Under the circumstances, the jury in this case had no occasion to consider reducing the plaintiff's damages as provided in IPI Civil 2d No. 105.08, or in reducing the plaintiff's damages as provided in IPI Civil 3d No. 45.07. It follows that plaintiff's argument that she is entitled to a new trial because the jury was given IPI Civil 2d No. 105.08 and because the jury was not given IPI Civil 3d No. 45.07 has no valid basis.

■■ We next address plaintiff's contention that defendants' closing arguments were so highly prejudicial that plaintiff was denied a fair trial. The closing arguments in the case lasted 1½ days and comprised 294 pages of the transcript. A total of 49 objections were made by plaintiff's attorney during the course of defendants' closing arguments and 40 of the objections were sustained. In most in-

stances where the objections were sustained, the trial court instructed the jury to disregard the remarks to which the objections were made. Plaintiff did not make a motion for a mistrial during or after closing arguments. The request for a new trial based on the closing arguments was made for the first time in plaintiff's post-trial motion.

Some of the typical statements in the closing arguments about which plaintiff complains include the following:

"(1) [D]efendant exercised good, reasonable judgment;

(2) The facts and the evidence show that his hypertension on April 9, 1981 was not under control. In fact, it was so out of control that it literally blew away 30 percent of the right side of his brain;

(3) That the catastrophic stroke ***;

(4) This is a patient who, just a few weeks before, missed therapy because he was downtown with the family visiting the lawyer;

(5) Dr. Robert Geller, I'd like to speak on him for a minute. Before I get started on those two experts, I'd like to apologize to you for anything I might have done in cross-examination of Geller or Levin. Sometimes the exuberance of defense counsel, and when I see a witness stretching out beyond where they should be and trying to fool the jury, it bothers me;

(6) Dr. Geller belongs on staff at Freeport Hospital, a 125 bed hospital. *** He is on the consulting staff at a small hospital 125 miles north of Milwaukee on Lake Winnebago, Theda Clark Hospital. Nowhere in his travels between Freeport and Mishicot or Neenah does he belong on any other staff at any hospitals in Milwaukee or anywhere in between there. His wife starts law school, and he wishes to volunteer to become a medical expert;

(7) He [Dr. Geller] goes to attorneys, he said once on cross-examination, they didn't come to him, no matter the merits of the case, no matter the worthiness of the case, no matter the medical issues, and asserts himself ***:

(8) And if you get past the hospitalization, and thanks to Tim Scarff he did, your chances of living five years, you have a 90 percent of chance that you aren't going to make it to five years. And Dr. Bitran, who testified in a deposition on behalf of Mr. Fisher, agrees;

(9) The clerk of the circuit court does not review allegations of a complaint to question the complaint's validity;

(10) I am not sure still, I know you weren't sure, what the criticisms of Sherman Hospital were;

(11) Dr. Dobben is right if he's telling you the truth, then any physician in this room, any defendant who's found liable, guilty, however you want to put it, for the death of Walter Fisher, will be unjustly convicted \*\*\*;

(12) We can talk more about Dr. Geller in terms of qualifications in talking about this case; but he knew when he got involved in this case that he had a theory to work backwards with and that is a man died of a brain abscess and let's find out who and why and perhaps how many we can condemn for that death \*\*\*."

Defendants argue that many of the statements about which the plaintiff complains were proper and not objectionable, and that the others were neither singularly nor cumulatively prejudicial.

After scrupulously reviewing all of the statements about which complaints were made in the closing arguments in the context in which the statements were made, we conclude that the trial court did not abuse its discretion in ruling on the objections or in denying the plaintiff's post-trial motion with respect to the closing arguments.

The record reflects that this case involved a long and difficult trial that was hard fought on both sides by very aggressive and competent counsel. The trial court should be commended for controlling the combativeness of all counsel and giving the parties exactly what they were entitled to receive—a fair trial.

Affirmed.

WHITE and FREEMAN, JJ., concur.