KYRIAKOS TSOUKAS, Plaintiff-Appellant, v. SUSANNA LAPID, Indiv. and as Agent, Employee and/or Servant of Lutheran General Hospital, *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—98—0200

Opinion filed June 30, 2000.

374

Nicholas C. Syregelas, of Nicholas C. Syregelas & Associates, of Chicago, for appellant.

Cassiday Schade & Gloor, of Chicago (James W. Kopriva, Donald F. Ivansek, Alison E. O'Hara, and Deborah Caldwell-Stone, of counsel), for appellees Lutheran General Hospital, Herbert Wigder, Susanna Lapid, Lawrence Bergman, and David Stewart.

McKenna Storer Rowe White & Farrug, of Chicago (James P. DeNardo, Sara E. Cook, and Julie Ramson, of counsel), for appellees Ansu Shah and Thomas W. Kornmesser.

JUSTICE O'BRIEN delivered the opinion of the court:

Plaintiff, Kyriakos Tsoukas, appeals a jury verdict rendered in favor of Drs. Lapid, Stewart, Widger, Kornmesser and Shah and Lutheran General Hospital, and summary judgment rendered in favor of Dr. Lawrence Bergman on plaintiff's medical malpractice complaint. On appeal, plaintiff contends the circuit court erred in: (1) barring the testimony of plaintiff's rebuttal pathology opinion witness as a violation of Rule 213 (166 Ill. 2d R. 213); (2) instructing the jury on comparative negligence instead of on a duty to mitigate damages; (3) admitting certain medical evidence and barring certain other medical evidence; (4) restricting plaintiff's closing arguments; (5) barring evidence that plaintiff's health maintenance organization (HMO) would not allow his operation to take place at Northwest Community Hospital; and (6) granting summary judgment for defendant Dr. Bergman. We reverse the jury verdict and remand for a new trial; we affirm the summary judgment for defendant Dr. Bergman.

Plaintiff filed suit for medical malpractice against defendants alleging that defendants failed to diagnose or treat an acute arterial occlusion when plaintiff was seen at Lutheran General Hospital's emergency room, which failure proximately caused the amputation of plaintiff's right foot one month later, that Dr. Widger abandoned his care of plaintiff, that defendants failed to conduct proper diagnostic tests and that Dr. Bergman refused to provide medical treatment or a referral to plaintiff.

At the jury trial, testimony revealed that on December 5, 1991, plaintiff, a 57-year-old man with diabetes, slipped and fell outside his apartment complex. Plaintiff went immediately to the emergency room at Holy Family Hospital complaining of ankle pain. There, an emergency room physician diagnosed plaintiff's complaint as ankle sprain, gave him a prescription and told him to follow up with Dr. Daniels.

The following day, plaintiff returned to Holy Family Hospital. At this visit, the treating physician told plaintiff to give the injury time to heal and instructed him to elevate the foot and apply hot packs.

On December 9, 1991, plaintiff went to see Dr. Shah at his office. Plaintiff testified that on this visit Dr. Shah referred him to an orthopedic surgeon. After attempting unsuccessfully to visit the orthopedic surgeon, plaintiff returned to Dr. Shah's office. Dr. Shah again instructed plaintiff to elevate his foot and apply hot packs and sent him home. According to plaintiff, at no time did Dr. Shah tell him he needed to be admitted to the hospital.

According to plaintiff, the condition of his foot was essentially unchanged between December 5, 1991, and December 31, 1991. Thus, on December 31, 1991, plaintiff went to see Dr. Katz, an orthopedic surgeon. Plaintiff testified Dr. Katz advised him to go to the emergency room. Plaintiff went to the emergency room at Lutheran General Hospital. There, plaintiff was examined by Dr. Stewart and Dr. Widger, who concluded he had a vascular insufficiency which required a vascular consult for proper diagnosis. Subsequently, Dr. Allman, a resident with the surgical service, not the vascular service, diagnosed plaintiff's condition as chronic vascular insufficiency. To confirm his diagnosis, Dr. Allman spoke with Dr. Kornmesser, the supervising on-call vascular surgeon, over the phone. Following this telephone consultation, Dr. Allman discharged plaintiff and instructed him to elevate his foot and apply hot and cold packs and to return in three days to see Dr. Kornmesser. According to plaintiff, neither Dr. Stewart, Dr. Widger, nor Dr. Allman told him he had a serious condition or that he had circulation problems.

According to plaintiff, he then tried to see Dr. Lawrence Bergman, a physician listed with his HMO. Plaintiff's daughter testified she called Dr. Bergman's office several times without reply.

Eventually, on January 9, 1992, plaintiff saw Dr. Spiro Stamelos, a doctor at Northwest Community Hospital. Dr. Stamelos examined plaintiff and diagnosed his condition as "acute vascular occlusion" and immediately admitted him to the hospital.

On January 10, 1992, Dr. Stamelos and Dr. Constantine Tatooles performed an arteriogram. The arteriogram revealed 100% occlusion of plaintiff's right leg. On January 11, 1992, in an attempt to salvage plaintiff's leg, Dr. Tatooles performed an embolectomy (revascularization) to clean the obstruction from the artery and to increase the flow of blood to the leg. Unfortunately, the damage to Tsoukas' leg was irreparable and, on January 28, 1992, Dr. Stamelos amputated plaintiff's foot. Plaintiff filed a complaint alleging defendants' improper diagnosis and treatment of an acute vascular occlusion, or blood clot, resulted in the amputation of his right foot.

Prior to trial, the circuit court granted summary judgment for Dr. Bergman. Following a four-week trial, the jury rendered a verdict in favor of the remaining defendants. The circuit court entered judgment on the jury's verdict and plaintiff appealed.

■ On appeal, we first consider the dispositive issue: jury instructions. A party has a right to have the jury instructed on his or her theory of the case if the facts in evidence or a reasonable inference from those facts supports the theory. *Aimonette v. Hartmann*, 214 Ill. App. 3d 314, 321, 574 N.E.2d 776, 780 (1991).

■ ■ Plaintiff contends the circuit court erred in deciding that either a comparative negligence or a mitigation of damages instruction had to be given to the jury, and that it further erred when it chose to give the comparative negligence instruction rather than the mitigation instruction. Comparative negligence applies where "[t]he plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it." Restatement (Second) of Torts § 465(1) (1965). Mitigation of damages imposes a duty on the injured party "to exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted." Black's Law Dictionary 904 (5th ed. 1979). See *Grothen v. Marshall Field & Co.*, 253 Ill. App. 3d 122, 127, 625 N.E.2d 343, 347 (1993).

In a medical malpractice action, therefore, a comparative negligence instruction is appropriate if a party presents a theory of the case in which the patient's negligence precedes or is contemporaneous with the physician's malpractice, for example, when a patient delays in seeking treatment for his or her medical condition or injury. *Smith v. Perlmutter*, 145 Ill. App. 3d 783, 496 N.E.2d 358 (1986) (delay in seeking treatment for heart attack). However, a mitigation of damages instruction is appropriate if a party presents a theory of the case in which the patient's negligence merely follows the physician's malpractice, for example, when a patient fails to participate in prescribed physical therapy. *Fisher v. Slager*, 201 Ill. App. 3d 480, 559 N.E.2d 118 (1990).

At trial, plaintiff's theory of the case was that he had formed an acute vascular occlusion (a blood clot), on or about December 5, 1991, and that Drs. Lapid, Stewart, Widger, Kornmesser, and Shah had misdiagnosed and mistreated the problem as a sprained ankle and/or chronic vascular occlusion (poor circulation), which caused the ultimate loss of his foot. The defendants' theory of the case was that, when plaintiff came to them for medical care, he was properly diagnosed with poor circulation due to diabetes and that it was plaintiff's subsequent failure to follow defendants' sound medical

advice to care for that condition which contributed to the formation of a blood clot on or about January 9, 1992, and the ultimate loss of his foot.

■At the jury instructions conference, plaintiff argued that if the circuit court intended to give either the comparative negligence (Illinois Pattern Jury Instructions, Civil, No. B10.03 (3d ed. 1995) (hereinafter IPI Civil 3d)) or the mitigation of damages (IPI Civil 3d No. 105.08) instruction, it should give the mitigation of damages instruction because anything plaintiff may have done to contribute to his own injury occurred after he sought treatment from the defendants, not before. The circuit court gave the comparative negligence instruction, but not the mitigation of damages instruction. Because plaintiff's theory of the case supported a mitigation of damages instruction and defendants' theory of the case supported a comparative negligence instruction, the court should have given both instructions.

Nevertheless, defendants contend the circuit court properly refused to give IPI Civil 3d No. 105.08 because the "Notes on Use" accompanying the instruction state, "[t]his instruction applies only to those instances where the *defendant* claims that the plaintiff has failed to mitigate his damages" (emphasis added). Thus, defendants argue the instruction would have been improper because it was *plaintiff* who requested it based upon *his* claim that anything he may have done to contribute to his own injury occurred after he sought treatment from the defendants while defendants "consistently maintained that plaintiff's own negligence was a *proximate cause* of his injury." We disagree.

The suggestion in the "Notes on Use" that only defendant's theory of the case can support a mitigation of damages instruction notwithstanding, plaintiff had the right to have the jury instructed on his theory of the case. Because plaintiff's theory of the case acknowledged the possibility that he *may* have done something which contributed to his injury *after* he sought treatment from defendants, plaintiff was entitled to a mitigation of damages instruction.

Further, the court should have instructed the jury as to the applicability of the mitigation of damages and comparative negligence instructions. Specifically, the circuit court should have instructed the jury that if it found that plaintiff's vascular occlusion occurred on or about December 5, 1991, then it should apply the mitigation of damages instruction (IPI Civil 3d No. 105.08), but that if it found that plaintiff's vascular occlusion occurred on or about January 9, 1992, then it should apply the comparative negligence instruction (IPI Civil 3d No. B10.03).

Further, the circuit court instructed the jury:

"If you find for Kyriakos Tsoukas and against one or more of the defendants, and if you further find that Kyriakos Tsoukas' injury was proximately caused by a combination of the negligence of that defendant or defendants and Kyriakos Tsoukas' contributory negligence, and that Kyriakos Tsoukas' contributory negligence was 50% or less of the total proximate cause of the injury or damage for which recovery is sought, then you should use Verdict form A ***.

\* \* \*

*If you find in favor of all defendants or that Kyriakos Tsoukas' contributory negligence was more than 50% of the total proximate cause of the injury or damage for which recovery is sought,* then you should use Verdict Form B." (Emphasis added.)

Verdict form B stated, "We, the jury find for all the defendants and against plaintiff." It did not require the jury to state whether it had found in favor of all defendants (1) because their treatment of plaintiff fell within the applicable standard of care, *or* (2) because their treatment fell below the applicable standard of care but plaintiff's comparative negligence was more than 50% of the total proximate cause of his injury. The jury returned verdict form B.

If the jury found in favor of all defendants because their treatment of plaintiff fell within the applicable standard of care, the circuit court's failure to give a mitigation of damages instruction was harmless error. However, if the jury found in favor of all defendants because their treatment fell below the applicable standard of care but plaintiff's comparative negligence was more than 50% of the total proximate cause of his injury, the circuit court's failure to give a mitigation of damages instruction was prejudicial error. Because the jury instructions and verdict form B render it impossible to make this determination, reversal and remand are required.

■ Next, we consider plaintiff's contention the circuit court erred in barring the testimony of plaintiff's pathology opinion witness as a violation of Supreme Court Rule 213. One of the primary purposes of Rule 213 is to avoid surprise. 166 Ill. 2d R. 213(g), Committee Comments. Because we reverse and remand for a new trial on other grounds, there is no need to set out the testimony of plaintiff's pathology opinion witness or determine whether it violated Rule 213. Even assuming, *arguendo*, the testimony of plaintiff's pathology opinion witness exceeded the bounds of proper rebuttal and violated Rule 213, no surprise will arise on retrial and the issue is now moot. See *Firstar Bank v. Peirce*, 306 Ill. App. 3d 525, 537, 714 N.E.2d 116, 123 (1999).

. Third, we consider plaintiff's contention the circuit court erred in admitting certain medical testimony and barring certain other medical

testimony. In particular, plaintiff contends the circuit court erred in (a) permitting defendants to use medical records of plaintiff's current physician in cross-examining plaintiff's cardiologist and expert witness; (b) permitting Dr. Olson to testify regarding shift-change procedures and then prohibiting plaintiff from asking Dr. Olson on cross-examination whether he had seen plaintiff after the shift change; (c) barring plaintiff from questioning the defendant doctors regarding their impressions of plaintiff's belief he only sprained his ankle; (d) limiting plaintiff to presenting one witness regarding causation and standard of care; and (e) allowing defendants to introduce evidence that plaintiff had an increased risk of limb loss due to diabetes.

On cross-examination, defendants asked plaintiff's cardiologist and expert witness about a reference in the medical records of plaintiff's current physician that plaintiff suffered from poor circulation in his left leg. Plaintiff argues this was error because no expert relied upon those records and they were not admitted into evidence. Defendants argue this was a proper evidentiary foundation for a subsequent question which tied the poor circulation caused by plaintiff's diabetes to plaintiff's risk for tissue loss in his left foot and leg.

■ Cross-examination is a matter of right and an important aspect of due process. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.9, at 416 (5th ed. 1990); *Millard Maintenance Service Co. v. Bernero*, 207 Ill. App. 3d 736, 748, 566 N.E.2d 379 (1990). The scope of cross-examination is left to the broad discretion of the circuit court. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.11, at 418-21 (5th ed. 1990). It is not improper to allow questioning to discover what potentially relevant information plaintiff's expert may have failed to consider in reaching an opinion. *Kurrack v. American District Telegraph Co.*, 252 Ill. App. 3d 885, 902, 625 N.E.2d 675, 686-87 (1993). Further, hospital records need not be admitted in order to elicit an expert medical opinion, providing they are of a type that is reliable. *Wilson v. Clark*, 84 Ill. 2d 186, 192, 417 N.E.2d 1322, 1324 (1981); 145 Ill. 2d Rs. 236(a), (b).

■ Here, plaintiff's expert testified that Dr. Stamelos called him for a consultation regarding plaintiff's condition on the evening of January 9, 1991. Plaintiff's expert further testified that he took a medical history and conducted a physical examination of plaintiff. The medical history indicated plaintiff had presented to Holy Family Hospital emergency room approximately one month earlier complaining of acute pain in his right leg and foot which started after plaintiff missed a step going down stairs. The physical examination revealed "purplish discoloration of the right foot with small blisters," "marked

tenderness," "coldness and no palpable pulses." Based upon this information, plaintiff's expert rendered the differential diagnosis that plaintiff "had a total occlusion of the artery that supplies [blood to] the leg and foot" resulting in the onset of gangrene. Defendants were entitled to test the reliability of this diagnosis by uncovering potentially relevant information plaintiff's expert may have failed to consider in reaching it. The medical records of plaintiff's current physician regarding plaintiff's circulatory problems constituted such information. Those records suggested it was poor circulation due to diabetes, not an occlusion, that may have caused plaintiff to lose his foot and leg. The circuit court did not abuse its discretion in this matter.

■ On direct examination, defendants elicited testimony from their expert, Dr. Olson, regarding shift-change procedures at Lutheran General Hospital's emergency room, which suggested that Dr. Olson had treated plaintiff after the shift change. On cross-examination, the circuit court prohibited plaintiff from asking Dr. Olson whether he had treated plaintiff after the shift change. Plaintiff argues this was unduly prejudicial because it was cumulative and otherwise left the jury with the false impression that Dr. Olson treated plaintiff after the shift change. We agree. At retrial, plaintiff shall be permitted to cross-examine Dr. Olsen on this matter.

■ Next, we consider plaintiff's contention the circuit court erred in barring him "from questioning the treating physicians about their impressions and opinions concerning the plaintiff's belief that he only had a sprained ankle." Specially, plaintiff argues he was improperly barred (a) from questioning the treating physicians regarding their diagnosis that he only had a sprained ankle, (b) from questioning the treaters about why they ignored the symptoms of his "acute vascular occlusion," and (c) from questioning the treating physicians with respect to their histories, impressions, findings, and opinions at the time they treated the plaintiff. Plaintiff asks this court to review seven pages of transcript in which the circuit court conducted a hearing on defendant's motion *in limine* number 15.

Defendants' motion *in limine* number 15 sought "to bar Dr. Stamelos, Dr. Anagnastopoulos, or Tatooles from testifying as to any misdiagnosis at Lutheran General Hospital or its physicians based on historical data from plaintiff or his family members, and that any exhibits containing such references being shown to the jury be redacted accordingly." Because it was the defendant doctors, not Dr. Stamelos, Dr. Anagnastopoulos or Dr. Tatooles, who allegedly misdiagnosed plaintiff's condition as a sprained ankle and allegedly ignored plaintiff's symptoms of acute vascular occlusion, plaintiff's first two arguments confuse plaintiff's freedom to question the former

group of treating physicians with the circuit court's restrictions on his freedom to question the latter group of treating physicians. Accordingly, plaintiff's first two arguments are not well taken.

Further, the deposition testimony of Dr. Stamelos and Dr. Anagnastopoulos indicates that their comments in plaintiff's medical records at Northwest Community Hospital regarding a misdiagnosis at Lutheran General Hospital were based solely upon a medical history taken from plaintiff or plaintiff's relatives, not upon their independent medical opinions. As this was an out-of-court statement by plaintiff or one of his relatives that plaintiff was attempting to offer for the truth of the matter asserted, specifically, that the doctors at Lutheran General Hospital misdiagnosed his condition, it was hearsay. In addition, as Dr. Stamelos, Dr. Anagnastopoulos and Dr. Tatooles testified as treating physicians, not experts, their testimony could properly be limited to the facts of plaintiff's treatment within their particular knowledge. Accordingly, the circuit court did not err in precluding Dr. Stamelos, Dr. Anagnastopoulos or Dr. Tatooles from testifying about their impressions and opinions concerning the plaintiff's belief that he only had a sprained ankle.

Next, we consider plaintiff's contention the circuit court erred in limiting plaintiff to presenting one witness regarding causation and standard of care. Plaintiff argues this was prejudicial in light of the defendants' multiple witnesses on the same issue.

■ The decision to allow, limit or exclude expert testimony is within the circuit court's discretion (*Knight v. Haydary*, 223 Ill. App. 3d 564, 577, 585 N.E.2d 243, 253 (1992)) and will be set aside only if arbitrary, fanciful or unreasonable (*Hilgenberg v. Kazan*, 305 Ill. App. 3d 197 (1999)). Moreover, as a general rule, an offer of proof must be tendered to preserve for review a question of the wrongful exclusion of evidence. *People v. Limas*, 45 Ill. App. 3d 643, 359 N.E.2d 1194 (1977); *People v. Slaughter*, 55 Ill. App. 3d 973, 371 N.E.2d 666 (1977); *People v. Nowak*, 76 Ill. App. 3d 472, 395 N.E.2d 28 (1979). The purposes served by an offer of proof are twofold: first, it allows the circuit court to initially ascertain the admissibility of the evidence sought to be introduced. Second, it enables the reviewing court to find in the record the nature of the proffered evidence and determine whether there was prejudicial error in excluding it. *People v. Duarte*, 79 Ill. App. 3d 110, 398 N.E.2d 332 (1979); *People v. Johnson*, 47 Ill. App. 3d 362, 362 N.E.2d 701 (1977); *People v. Moore*, 27 Ill. App. 3d 337, 326 N.E.2d 420 (1975); *People v. Brown*, 27 Ill. App. 3d 569, 327 N.E.2d 51 (1975).

■ Here, the circuit court, already facing a four-week trial, limited the number of experts equally for each party. Plaintiff's suggestion that multiple defense experts were cumulative and thus prejudicial is

not supported by the record. The multiple defense experts were the result of multiple defendants, each entitled to present an expert in his own defense. Moreover, it was incumbent upon plaintiff to present an offer of proof for the expert whose testimony was excluded; plaintiff failed to state what additional insight the proposed experts would have provided. Absent this guidance, this court cannot conclude the circuit court abused its discretion.

█ Next, we consider plaintiff's contention the circuit court erred in allowing evidence that plaintiff had an increased risk of limb loss due to diabetes. Each party is entitled to present evidence supporting his theory of the case. *Leonardi v. Loyola University*, 168 Ill. 2d 83, 94, 658 N.E.2d 450, 455 (1995). Here, defendants' theory of the case was that the amputation of plaintiff's foot was the result of gangrene caused by poor circulation secondary to diabetes. Accordingly, evidence that plaintiff had an increased risk of limb loss due to diabetes went to the issue of causation and was properly admitted.

█ Fourth, we consider plaintiff's contention the circuit court erred in restricting plaintiff's closing arguments in scope and length. The scope of closing argument is within the sound discretion of the circuit court, and its rulings in this regard will not support reversal unless prejudicial. *Lewis v. Cotton Belt Route-St. Louis Southwestern Ry. Co.*, 217 Ill. App. 3d 94, 110-11, 576 N.E.2d 918, 932 (1991); *O'Neil v. Continental Bank, N.A.*, 278 Ill. App. 3d 327, 340, 662 N.E.2d 489, 498 (1996). "[C]ounsel may not misrepresent the evidence, argue facts not in evidence, nor 'create his own evidence' " during closing argument. *Lecroy v. Miller*, 272 Ill. App. 3d 925, 933, 651 N.E.2d 617, 622 (1995), quoting *Poole v. City of Rolling Meadows*, 253 Ill. App. 3d 154, 161 (1993). Moreover, Illinois law has long provided that the length of closing argument is within the discretion of the circuit court (*Monmouth Mining & Manufacturing Co. v. Erling*, 148 Ill. 521, 534, 36 N.E. 117, 121 (1894)), and its decision in this regard will not be disturbed absent manifest abuse of discretion (*Hansell-Elcock Foundry Co. v. Clark*, 214 Ill. 399, 415, 73 N.E. 787 (1905); *Schmidt v. Blackwell*, 15 Ill. App. 3d 190, 199, 304 N.E.2d 113, 120 (1973)).

█ Regarding his closing argument, plaintiff first contends the circuit court erred in prohibiting him from stating to the jury that no one had testified they treated plaintiff after the shift change. The shift change occurred at 8 p.m. Testimony revealed that Dr. Lapid took plaintiff's medical history around 9:20 p.m. Further testimony revealed that Dr. Allman, a senior surgical resident, evaluated plaintiff's condition, conferred with Dr. Kornmesser, the supervising on-call vascular surgeon, by telephone, and informed plaintiff the swelling was due to a sprain, but plaintiff's chronic, underlying vascular condi-

tion required follow-up care. Finally, testimony revealed that Dr. All-man instructed plaintiff to contact Dr. Kornmesser for an appointment on January 2. Because the evidence revealed that plaintiff was examined, evaluated, and instructed regarding his condition and the need for follow-up care after 8 p.m., the circuit court properly prohibited plaintiff from telling the jury that no one treated him after the shift change. Plaintiff's testimony that three attempts were made to contact Dr. Kornmesser, but he "received no reply," does not support a closing argument that no one treated him after the shift change.

Regarding his closing argument, plaintiff next contends the circuit court erred in prohibiting him from arguing contributory negligence. The relevant portion of plaintiff's closing argument reads:

"PLAINTIFF: *** [I]f you find that my client perhaps did something wrong, then you have to find out where he did that wrong because they are alleging contribution [sic], not mitigation, contribution [sic]. And there is a difference between the two. Contribution [sic] means that I can—

DEFENDANTS: Objection, your Honor.

THE COURT: Sustain the objection. The jury will disregard that.

PLAINTIFF: The judge will instruct you contribution [sic] is—

THE COURT: Contributory negligence.

PLAINTIFF: What contributory negligence is. But they must testify to that. So where was he contributory? Did he create the condition? No. You cannot find that he was contributory because he didn't create the condition.

DEFENDANT: Objection, your Honor.

THE COURT: Sustain the objection, counsel.

PLAINTIFF: At what point Dr. Shah had an opportunity to diagnose and cure it? From that point forward then Dr. Shah can't step back and say, well, gee, you know, a lot of people had a chance to cure this, it is their problem they didn't cure it. No, ladies and gentlemen, she is liable from that moment on. She had a chance to cure that. And she didn't. See, you have to look at that evidence very hard. And if you find that my client was contributorily negligent, then you want to assess a percentage of the damage. That doesn't mean that he can't win the case. If you find that he is less than 50 percent negligent you must award him the money. It is only the percentage that you will deduct from him, if you find. But I submit to you that he was not because he went with his records in hand from doctor, to doctor to doctor."

Because the record reveals that plaintiff confused the concepts of contribution and contributory negligence in closing argument, the circuit court properly sustained defendants' objections. Moreover, because the circuit court did permit plaintiff to argue the concept of

contributory negligence to the jury, plaintiff's argument is without merit.

Plaintiff next contends the circuit court erred in limiting the time for his closing argument to 1 hour and 40 minutes. At the time of closing argument, 1 of the 12 jurors had already been dismissed, 2 others were due to leave the country, and another 2 jurors were due to serve as election judges in local elections. If the jury was to have adequate time to deliberate, a restriction on the length of closing arguments was necessary. Plaintiff fails to establish that the 1-hour-and-40-minute restriction imposed by the circuit court prejudiced his case. Accordingly, we find no error.

■ Fifth, we consider plaintiff's contention the circuit court erred in barring evidence that his HMO would not allow his operation to take place at Northwest Community Hospital. Plaintiff argues this evidence should have been admitted to support plaintiff's claim he was diligent in seeking medical care. Defendants counter that the circuit court's ruling was proper because the proposed evidence would have violated a ruling *in limine* barring evidence about plaintiff's HMO coverage and because the HMO allowed plaintiff's operation to take place at Northwest Community Hospital on January 11, 1992. Further, defendants contend the proposed evidence was presented to the jury through the testimony of Dr. Tatooles so that the circuit court's error, if any, was harmless. On cross-examination by defense counsel for Dr. Kornmesser, Dr. Tatooles testified:

> "DEFENSE COUNSEL: *** [W]hen you examined the arteriogram and the patient on the evening of [January 10, 1992], it was your preference and your advice to go right ahead with surgery at that time?
>
> DR. TATOOLES: That night, yes.
>
> DEFENSE COUNSEL: But that was not possible and then you planned to do it first thing the next morning, right?
>
> DR. TATOOLES: It wasn't possible because the patient couldn't get clearance from his insurance company. And it made a—he was very much upset about not having the approval. And there was a big problem with that."

Each party is entitled to present evidence supporting his theory of the case. *Leonardi*, 168 Ill. 2d at 94, 658 N.E.2d at 455. Here, plaintiff's theory of the case was that the amputation of his foot was due to the negligence of the defendant doctors, not to any contributory negligence on his part in failing to seek treatment or follow doctor's orders. Because plaintiff's evidence went to the issue of contributory negligence, it should have been admitted. Moreover, it should have been admitted on direct examination; plaintiff is not required to rely

upon the inadvertent introduction of evidence by defendants during cross-examination to prove his case. In so holding, we are mindful that plaintiff's HMO had been dismissed from this case before trial and that as a result the circuit court had issued a ruling *in limine* barring evidence about plaintiff's HMO coverage. Accordingly, on retrial the evidence should be admitted, but the jury should be given a limiting instruction regarding its applicability to plaintiff's case.

■ Finally, we consider plaintiff's contention the circuit court erred in granting summary judgment for defendant Bergman. A physician's duty is limited to those situations in which a direct physician/patient relationship exists or there is a special relationship. *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 85, 660 N.E.2d 253, 259 (1996). The determination of whether a duty exists is an issue of law to be determined by the court. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525, 513 N.E.2d 387, 396 (1987).

Plaintiff admits he had no direct physician-patient relationship with Dr. Bergman but argues a special relationship existed because Dr. Bergman was listed with plaintiff's HMO as an approved provider and because plaintiff's daughter called Dr. Bergman several times in an attempt to schedule an appointment.

In Illinois, mere contact between an individual and a physician does not give rise to a duty on the part of the physician. See *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 85, 660 N.E.2d 253, 259 (1996); *Nichelson v. Curtis*, 117 Ill. App. 3d 100, 452 N.E.2d 883 (1983); *Fure v. Sherman Hospital*, 55 Ill. App. 3d 572, 371 N.E.2d 143 (1977). However, Illinois courts have not considered the specific issue presented here. Accordingly, we look to other jurisdictions for guidance. In *Weaver v. University of Michigan Board of Regents*, 201 Mich. App. 239, 241, 506 N.W.2d 264, 265 (1993), the Michigan court, under similar circumstances, held that a telephone call to schedule an appointment with a physician does not establish a physician-patient relationship where the caller has no ongoing physician-patient relationship with the medical provider. Because the Michigan court's holding is consistent with similar Illinois case law, we adopt that court's reasoning and find no duty. Given the absence of a duty, summary judgment was not error.

For the foregoing reasons, we reverse the jury verdict and remand

for a new trial and affirm the summary judgment for defendant Dr. Bergman.

Affirmed in part and reversed in part; cause remanded with instructions.

ZWICK, P.J., and BUCKLEY, J., concur.